JUDGE DAVID BRIONES

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

FILED

2014 APR -4  PM 2: 25

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY

| | |
|---|---|
| MARIA SALDANA-FOUNTAIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF THE TREASURY | ) |
| INTERNAL REVENUE SERVICE, | ) |
| 1500 Pennsylvania Avenue, N.W. | ) |
| Washington, DC 20220 | ) |
| | ) |
| JACOB LEW, in his official capacity as | ) |
| SECRETARY OF THE UNITED STATES | ) |
| DEPARTMENT OF THE TREASURY, | ) |
| 1500 Pennsylvania Avenue, NW | ) |
| Washington, DC 20220 | ) |
| | ) |
| Defendants | ) |

**EP14CV0124**

Civil Action No. _____

## COMPLAINT

1.    Plaintiff, proceeding pro se, respectfully requests this Court consolidate complaints IRS-11-0198-F and IRS-11-0376 (Appeals No. 0120123195 and 0120123370) as both complaints stem from the same facts and circumstance against same defendants. Plaintiff brings this complaint against Defendants for equitable relief, compensatory and other damages resulting from discrimination and/or retaliation based on whistleblowing, age, sex, military background/affiliation (profiling) and reprisal for participating in protected activity (EEOC).    Plaintiff suffered harassment, hostile work environment, disparate treatment, profiling, reprisal and/or retaliation. Plaintiff hereby respectfully invokes Due Process pursuant to the 14th Amendment, Equal Rights Clause in the adjudication of this complaint.  Plaintiff hereby asserts the 7th Amendment to the United States Constitution in requesting trial by jury as mandated by the Constitution of the United States.

## JURISDICTION AND VENUE

2    This Court has subject matter jurisdiction over this action pursuant to:

(A) 28 USC § §1331 (Federal Question); (B) Whistleblower Retaliation in violation of Civil Service Reform Act (CRSA), Whistleblower Protection Act (WPA), Whistleblower Protection Enhancement

1

Act of 2007, Prohibited personnel practices (5 U.S.C. § 2302 and 2302(b)(8)); (C) Age Discrimination in violation of Age Discrimination in Employment Act of 1967 (ADEA), as amended § 621 et seq., 29 USC §§ 621-34; (D) Sex Discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 USC §§ 2000e et seq.; (E) Military Background/Affiliation (Profiling) Discrimination in violation of Title 38, U.S.C. § 4311; The Americans With Disabilities Act (42 USC §§ 12102 et seq.) (ADA).

The issues before this Court:

(a) Whether Plaintiff was retaliated against for Whistleblowing due to her reporting to IRS Management the destruction of government documents, destruction of Taxpayer's information and making a formal report to TIGTA in compliance with TIGTA's Regulations and/or Prohibited Personnel Practices (EEOC).

(b) Whether Plaintiff was discriminated against based on age (50) when she was non-selected for Individual Taxpayer Advisory Specialist ("ITAS"), GS-0501-5, vacancy announcement number 40-4110F4249B when three younger candidates were rated and/or selected for position.

(c) Whether Plaintiff was discriminated based on age (50) when she was non-selected for Individual Taxpayer Advisory Specialist ("ITAS"), GS-0501-7, vacancy announcement number 40-4110F4250B when three younger candidates were rated and/or selected for positions.

(d) Whether Plaintiff was discriminated based on age, sex and/or retaliated against when Plaintiff was instructed by Management not to apply to the GS-9 ITAS position while instructing younger candidates to apply to position.

(e) Whether Plaintiff was discriminated based on sex when she was non-selected for GS5 and GS7 ITAS vacancy positions and a younger male was selected for position;

(f) Whether IRS Management profiled Plaintiff as a perceived threat based on her military background and/or affiliation which led to Plaintiff being the subject of hostile work environment, disparate treatment and management's wrongful termination.

(g) Whether Plaintiff was subjected to harassment, hostile work environment, bullying and disparate treatment by Management and/or coworkers, in retaliation for whistleblowing and/or filing an EEOC complaint.

(h) Whether Plaintiff was the subject of retaliation and/or reprisal by Management when on February 24, 2011, Plaintiff was wrongfully terminated from her employment without cause or provocation.

i) Whether Management used Plaintiff's status as a "probationary employee" as pretext for retaliation when Plaintiff was fired two working days prior to probationary period ending.

3.      Venue is proper in this judicial district pursuant to 28 USC §§ since "a substantial part of the events or omissions giving rise to the claim[s] occurred" in Texas.

4.      Plaintiff brings this civil action pursuant to federal statute and common law.

## THE PARTIES

5.      Plaintiff, "Maria Saldana-Fountain", hereinafter "Plaintiff" is an adult individual currently residing at 10919 Joe DiMaggio Cir, El Paso, Texas, 79934.  Plaintiff was employed as a clerk, initial assistance representative with the Internal Revenue Service ("IRS") located at 700 E. San Antonio, El Paso, TX 79901, an agency of the United States Department of the Treasury ("Treasury").

6.      The Defendant "Jacob J. Lew" is an adult individual that serves as the Secretary of the Treasury for the United States.  Mr. Lew is being sued herein for compensatory damages and other damages in his official capacity based upon the discriminatory and/or retaliatory actions of subordinate employees acting on his behalf.

## FACTUAL BACKGROUND

7.      Plaintiff is a veteran with 20 years of honorable service in the United States Army.

8.      Plaintiff earned her Bachelor of Science on or about 2006.

9.      Plaintiff was employed in March 1, 2010 as a Clerk, Initial Assistance Representative-Permanent, ("IAR"), Bilingual, GS 0303-05 at the Agency's Wage and Investment Division, Internal Revenue Service, El Paso, TX.

10.     Plaintiff was employed as a seasonal, permanent, full time employee and therefore was subject to furlough status.

10.     On or about June 9, 2010, Plaintiff reported to Mrs. Vanhoutan ("Manager") the destruction of government documents, destruction of Taxpayer's information by coworker with Management's approval.

11.     Plaintiff received a Fully Successful Performance Appraisal in July 27, 2010.

12.     No formal and/or informal negative counseling was ever created by Management on Plaintiff prior to wrongful termination of February 24, 2011. It was only during the termination that Vanhoutan ("IRS Manager") stated that statements from Taxpayers were being generated to support Plaintiff's termination.

13      Plaintiff received excellent comments from Senior Co-workers and Taxpayers regarding her work. [Luera, GS-11, Abbott, GS-11, Rivera, GS-11, Seda, GS-11, Hernandez, GS-9].  Affidavits to be supplemented.

14.     During the course of her employment with the IRS, Plaintiff was retaliated, harassed, subjected to a hostile work environment, subjected to disparate treatment and bullied by Management (Vanhoutan) and coworkers.

## FIRST CAUSE OF ACTION
### (Retaliation based on Whistleblower and/or participating in Protected Activity (EEOC))

15.     Plaintiff reasserts and incorporates claims contained in paragraphs 1 through 13 as set forth above.

16.     Defendant, by and through his management employees, retaliated against Plaintiff due to her reporting to IRS Management (Vanhoutan) the destruction of government documents, destruction of Taxpayer's information, and making a formal report to Treasury Inspector General for Tax Administration ("TIGTA") in compliance with TIGTA's Regulations.  Plaintiff suffered retaliation, harassment, hostile work environment and disparate treatment for participating in whistleblowing and/or protected activity as follows:

16.1     When on or about June 9, 2010, Plaintiff reported to Vanhoutan ("IRS Manager") the destruction of government documents, destruction of Taxpayer's information by coworker with Management's approval.  Plaintiff conveyed to Vanhoutan that she was not comfortable participating in those activities unless it was in writing.  Vanhoutan refused to provide directions in writing.

16.2     When on or about June 11 and 16, 2010, Vanhoutan condoned certain employees to refer to Plaintiff as a "snitch".

16.3     When on or about June 24, 2010, Vanhoutan screamed at Plaintiff for requesting to be present during a meeting in which Plaintiff was being discussed based on a CSIRC Report made on a hostile Taxpayer.

16.4     When on or about June 28, 2010, Vanhoutan condoned Arredondo's instructions for Plaintiff to lie to a soldier's wife.  Arredondo claimed the wife was coming to cause her (Arredondo) harm due to some personal matter.

16.5     When on or about June 30, 2010, Vanhoutan condoned Arredondo's screaming and threatening Plaintiff in front of coworkers and Taxpayers. Acting Manager Abbott counseled Arredondo.

16.6     When on or about July 12, 2010, Vanhoutan refused repeatedly to submit Plaintiff's Performance Appraisal while all other employees that were required such appraisal were given one immediately.

16.7     When on or about July 14, 2010, Vanhoutan refused to speak with Arredondo regarding missing numerous appointments with Taxpayers and Taxpayers getting upset.

16.8     When on or about July 15, 2010, Ogden contacted Plaintiff by email for fingerprinting and ID card for Tax Compliance Officer ("TCO") position. Approximately one week later, the offer for this position was cancelled.

16.9     When on or about July 16, 2010, Arredondo generated an email to Abbott (acting manager) blaming Plaintiff for Taxpayer's complaints on Arredondo. Abbott verbally counseled Arredondo and brought concerns to Vanhoutan who refused to formally counsel Arredondo.

16.10    When on or about July 20, 2010, Plaintiff was walking on the pedestrian zone when Arredondo attempts to run Plaintiff over with her SUV. Plaintiff's right hand was slightly burned as the coffee spilled in running across to avoid being hit by Arredondo's vehicle. Plaintiff reported this incident to Vanhoutan immediately and also shared this incident with Luera, Puga, Rivera Bustamante. Vanhoutan refused to formally counsel Arredondo on this incident.

16.11    When on or about July 23, 2010, Plaintiff submitted complaints from Taxpayers regarding Arredondo missing several other appointments. Cano acknowledged Arredondo had missed all of the morning appointments. Vanhoutan refused to counsel Arredondo.

16.12    When on or about July 30, 2010, Vanhoutan again refused to submit Plaintiff's performance appraisal required in the evaluation of ITAS positions. Vanhoutan refused to return calls from Puga, acting Manager. It was only after, HR contacted Plaintiff informing her that Vanhoutan had not submitted required documents that Plaintiff learned that Vanhoutan had submitted all required documents on the other candidates (Rosales, Madrid, Ramirez).

16.13    When on or about August 5, 2010 Plaintiff received rating letter stating another candidate had been selected for the first TCO position per management. Gonzales (HR) advised Plaintiff the selection was confidential and she could not provide any further information.

16.14    When on or about August 5, 2010 Plaintiff received rating letter her ineligible for second TCO position per management. Gonzales (HR) advised Plaintiff the selection was confidential and she could not provide any further information.

16.15    When on or about September 10, 2010, Plaintiff informed Vanhoutan of the TIGTA report she filed on the June 9, 2010 concerns.

16.16    When on or about October 28, 2010, Plaintiff was "Non-Select per Management" for the ITAS vacancy announcement numbers 40-4110F4249B and 40-4110F4250B

16.17   When on or about November 4, 2010, Plaintiff was informed by coworker and confirmed by Grajeda, secretary, that all other seasonal employees had been called back and had been working three weeks except for Plaintiff

16.18   When on or about November 4, 2010@1300hrs, Plaintiff was informed by Grajeda and Madrid (coworker), that an employee from the Revenue Department had been brought by Vanhoutan to work Plaintiff's IAR position.

16.19   When on or about November 4, 2010@1530hrs, Plaintiff questioned Vanhoutan why she (Plaintiff) was the only seasonal employee not called back from furlough status. Vanhoutan stated she (Vanhoutan) was not required to call Plaintiff until there was a need for IAR in the TAC Area.  Plaintiff than questioned Vanhoutan as to why if there was no need for an IAR why was Rick Ramirez brought from the Revenue Department and was now working IAR in Plaintiff's position and Vanhoutan became annoyed with Plaintiff and finally agreed that Ramirez along with all other seasonal employees had been working for three weeks but that it was not her fault because she had told Abbott to call Plaintiff and that she (Vanhoutan) could only "guess that they forgot".

16.20   When on or about November 14, 2010, Plaintiff was denied IAR formal training by Vanhoutan.

16.21   When on or about December 18, 2010, Plaintiff contacted Vanhoutan and informed her that an EEO Complaint had been initiated.  Vanhoutan became visibly red and shaking with anger.

16.22   When on or about December 20, 2010, Plaintiff was on her first day on duty status and Rachel Grajeda, secretary, confirmed Ramirez had been working Plaintiff's IAR position for three weeks and he had also been assigned and promoted to the ITAS position by Vanhoutan.

16.23   When on or about December 20, 2010, Arredondo physically bumped Plaintiff abruptly on her arm as she was passing by.  Arredondo exclaimed loudly, "Excuse You!" Plaintiff reported incident immediately to Vanhoutan who stated she would talk to Arredondo. Vanhoutan added that she was aware that the previous year the "girls" had been rough with Plaintiff.  Plaintiff reminded Vanhoutan about Arredondo's attempt to run Plaintiff over and Vanhoutan acknowledged talking to Arredondo regarding this matter.

16.24   When on or about January 12, 2011, Plaintiff was denied request for mandatory IDRS Training by Vanhoutan while all other employees were given training.

16.25   When on or about January  2011, Plaintiff was denied access to FAMIS for Training by Vanhoutan.

16.26   When on or about January 2011, Paul Ramos, "Territory Manager", stated to Plaintiff she needed to, "watch out for Charla, she is out to get you". Plaintiff questioned why and Ramos stated, "Charla wants you fired".

16.27   When on or about January 18, 2011, Plaintiff was denied access to IDRS by Vanhoutan. Plaintiff questioned how denying access to IDRS would reflect on her performance appraisal, as this was a requirement in IAR's. Vanhoutan refused to address Plaintiff's concerns and instead assigned her to do manual work removing heavy boxes from publication room.

16.28   When on or about January 21, 2011, Vanhoutan refused to assist Plaintiff with the filing of the Comp Time Travel Worksheet.

16.29   When on or about January 27, 2011, Vanhoutan refused to allow Plaintiff to read Seasonal Employment Agreement prior to signing it. Vanhoutan falsely stated this was a" generic form" and directed Plaintiff to sign it, immediately. In comparing Seasonal Employment Agreements the next day, the 2010 agreement stated Plaintiff was subject to nonduty/nonpay status, recall to duty/pay status and expectations of work are determined by the availability of work and in the 2011 agreement was subject to nonduty/nonpay status, recall to duty/pay status and expectations of work are determined by the nature of the work. In so doing, management was deceptive in attempting to justify why Plaintiff was the only employee that was not called back to duty when all other seasonal employees were called back to include Ramirez.

16.30   When on or about February 2, 2011, Plaintiff was the only employee required to work while all other employees were informed to stay at home due to inclement weather. Plaintiff was denied pay and/or comp time for this day by Vanhoutan.

16.31   When on or about February 4, 2011, Vanhoutan denied on the on the job training in processing checks by IDRS to Plaintiff.

16.32   When on or about February 4, 2011, Vanhoutan repeatedly denied Plaintiff access to the overtime schedule and overtime work. All other employees were given access to overtime schedule and allowed to work overtime on numerous occasions.

16.33   When on or about February 7, 2011, coworker discussed her personal interactions with a Revenue Agent and a Tax Compliance Officer that involved drug use. Plaintiff informed Vanhoutan who threatened Plaintiff to keep quiet and discouraged her from reporting it.

16.34   When on or about February 11, 2011, Madrid, coworker, yelled at and threatened Plaintiff by putting her finger in Plaintiff's face in front of all Taxpayers. Plaintiff was assigned to work in the stock room doing labor while being monitored by Vanhoutan all day.Madrid remained in the front.

16.35    When on or about February 14, 2011, Plaintiff emailed Vanhoutan after being persistently monitored and/or harassed by her and her "girls" stating Plaintiff's view that her job is in jeopardy.  Management refused to address Plaintiff's concerns.

16.36    When on or about February 14-16, 2011, Plaintiff was assigned to work/cover the front desk until Madrid came in at 09:30 am.   The rest of the day Plaintiff was assigned to do labor in the stock room while being monitored by Vanhoutan, continuously.

16.37.  When on or about February 15, 2011, Vanhoutan continues to monitor Plaintiff only.

16.38    When on or about February 15, 2011, Vanhoutan falsely stated to Reese, territory manager, that Plaintiff 's chair had bumped into Madrid's chair making her (Madrid) feel threatened.  Vanhoutan falsely stated to Reese that she had spoken with Plaintiff about this.

16.39    When on or about February 16, 2011, Plaintiff contact with Region 7, FPS Chief regarding ongoing collusion between Wage and Investment Department ("W&I"), Federal Protective Services ("FPS") and contracted security guards.  Plaintiff conveyed concerns that her job was in jeopardy as she was being retaliated by Management.  Plaintiff conveyed Management's creative ways in attempting to make Plaintiff be viewed as a threat.

16.40    When on or about February 17, 2011, Plaintiff reported abuse of power and collusion between W&I Management, FPS and contracted security guards.  Plaintiff informed Vanhoutan on initiated report with FPS (non-local agency).

16.41    When on or about February 17, 2011, Diana Cano, coworker, screamed at Plaintiff, "Do you have any common sense" in the TAC area full of Taxpayers.  Cano than became enraged and pushed Madrid's empty chair and hit desk where Plaintiff was sitting.  Plaintiff addressed her concerns immediately with Vanhoutan who refused to address this matter further by stating that she was busy. See Plaintiff's Exhibit 44 and 45.

16. 42    When on or about February 18, 2011, Ms. Cano becomes belligerent by physically throwing desk items at Plaintiff in front of Taxpayers.  Cano stated to Plaintiff that Mrs. Vanhoutan showed her the emails Plaintiff was sending regarding her (Cano) and the other coworkers.

16.43    When on or about February 22, 2011 at approximately 10:00a.m., Pat Lopez, spec secretary, threw a heavy package that landed loudly on Plaintiff's desk as she was sitting.

16.44    When on or about February 22-23, 2011, Mrs. Vanhoutan continued to monitor Plaintiff all day while sending Cano to harass and threaten Plaintiff by throwing scissors, banging desks and throwing files at Plaintiff.

16.45   When on or about February 24, 2011@08:09 am, Arredondo suggested to Taxpayer to file a false complaint on Plaintiff. Plaintiff informed Vanhoutan by email. Vanhoutan refused to address the incident and instead continued to monitor Plaintiff.

16.46   When on or about February 24, 2011, Management fired Plaintiff without cause or provocation. See Plaintiff's Exhibit 23 thru 27. Management has failed to uphold its' legal obligations in proving the allegations of their termination based on "performance and conduct". Plaintiff's performance appraisal clearly contradicts IRS Management's fraudulent allegations. See Plaintiff's Exhibit 20 thru 22.

16.47   When on or about February 24, 2011, Management used Plaintiff's status as a "probationary employee" as pretext for retaliation when Plaintiff was fired two working days prior to probationary period ending.

16.48   When on February 24, 2011, Management used an incident of February 17, 2011 in which Plaintiff aided a child (approximately 1-2 years old) who was not breathing by clearing the child's throat. Plaintiff responded to the child only after seeing contracted security guard Lopez seemed to go into shock/he froze and not apply any type of aid to the child. Plaintiff learned on February 24, 2011, while being fired that this incident was being used to support her being fired. Plaintiff was never issued any type of negative and/or positive counseling regarding this incident, prior to and/or after termination. Due to the ongoing collusion among W&I (IRS), FPS and contracted security guards in providing any type of documentation regarding this incident, Plaintiff requested incident report from Department of Homeland Security on or about August 2011. See Exhibit 28 thru 31. The incident report does reflect nor support any of the allegations made by IRS Management, FPS nor contracted security guard Lopez. Management based Plaintiff's termination on fraud and collusion. Furthermore, the Texas Workforce Investigator stated, "PD. CREDENCE TO CLAIMANT; EMPLOYER FAILED TO PROVE MISCONDUCT INVOLVING AIDING A CHILD" as part of their investigation. See Plaintiff's Exhibit 32 thru 38. Plaintiff learned of this allegation for the very first time on February 24, 2011, while being fired.  Plaintiff was never issued any type of negative and/or positive counseling regarding this incident, prior to termination.

16.49   When on February 24, 2011, Management fraudulently fabricated and/or generated an alleged incident on termination letter of "July 2010" of theft of plant cuttings against Plaintiff. Plaintiff learned of this allegation for the very first time on February 24, 2011, while being fired. Plaintiff was never issued any type of negative and/or positive counseling regarding this false allegation, prior to termination. According to Homeland Security through FOIA request, no incident

report was ever created by FPS and/or contracted security guards, which they are required to do in such serious and/or ridiculous allegations.

16.50   When on or about February 24, 2011, Management, deceptively, used Plaintiff's own reported incident to TIGTA, FPS and CSIRC of a hostile Taxpayer against her (Plaintiff).  See Exhibit 39 thru 42. Plaintiff learned this incident was being used to support Plaintiff's termination for the very first time on February 24, 2011, while being fired. In the termination letter Management uses June 21, 2010 to refer to this incident while Plaintiff reported the incident occurred June 24, 2010. Plaintiff was never issued any type of negative and/or positive counseling regarding this incident, prior to termination.

16.51   When on February 24, 2011, Management maliciously used the incident of January 26, 2011, between Madrid (IAR coworker) and Cano (ITAS coworker) against Plaintiff.  It was Madrid and Cano who argued back and forth, during a meeting, with each other regarding Madrid sending Taxpayers into Cano's cubicle and Cano complaining that she had PII info.  Plaintiff was never involved other than to ask for clarification at the end.

16.52   When on February 24, 2011, Management maliciously alleges in an undated incident "You refused to make copies....." against Plaintiff to support termination.  Plaintiff and all other employees had been directed to explain to Taxpayers that making copies was a courtesy.  Plaintiff did not refuse to make copies but requested Taxpayer wait in line.  Plaintiff learned of this allegation for the very first time on February 24, 2011, while being fired.  Plaintiff was never issued any type of negative and/or positive counseling regarding this allegation, prior to termination.

16.53   When on February 24, 2011, Management maliciously alleges in an undated incident, "On another occasion, you had an altercation with a United States Postal Employee......" to support Plaintiff's termination.  This incident occurred in March 2010, Plaintiff was a new employee and Vanhoutan had instructed Plaintiff not to accept any mail as she (Plaintiff)  as a new employee and did not know where to deliver.  Mailman became annoyed at Plaintiff because she explained she could not accept mail.  Mailman angrily responded to Plaintiff by loudly stating, "Than what the fuck is your job?"  Vanhoutan was informed and so was mailman's supervisor was not yet aware where to deliver to departments.  Plaintiff learned of this allegation for the very first time on February 24, 2011, while being fired.  Plaintiff was never issued any type of negative and/or positive counseling regarding this allegation, prior to termination.

16.54   When Vanhoutan continuously denied Plaintiff overtime work hours while all other employees worked overtime hours.

16.55   When Vanhoutan continuously denied Plaintiff access to the overtime schedule while all other employees were allowed access.

## SECOND AND THIRD CAUSE OF ACTION
### (Age and (Sex) Gender Discrimination)

17.   Plaintiff reasserts and incorporates claims contained in paragraphs 13 through 16.55 as set forth above.

18.   Defendant, by and through his management employees, discriminated against Plaintiff on the basis of age (50) and/or sex (female) as follows:

18.1   When Plaintiff was non-rated and/or non-selected for the ITAS position in grade 5, while a younger and/or male employee applicants were rated (Rick Ramirez, Erica Madrid, Amparo Rosales).

18.2   When Plaintiff was rated "Best Qualified" and was non-selected for the ITAS position in grade 7, while a younger and/or male employee applicants were selected (Ramirez, Madrid, Rosales).

18.3   When Manager directed Plaintiff not to apply for the ITAS position grade 9, while younger and/or male employee applicants were encouraged to apply (Ramirez, Madrid, Rosales).

18.4   When Plaintiff was treated disparately from the two selected applicants, Ramirez, age (35), male, Madrid (), Female, Rosales (36), Female.

18.5   When Vanhoutan was deceptive in stating to Plaintiff that she (Vanhoutan) was not part of the selection process.


## FOURTH CAUSE OF ACTION
### (Retaliation and/or Discrimination based on Military Background/Affiliation in Profiling)

19.   Plaintiff reasserts and incorporates claims contained in paragraphs 17 through 23 as set forth above and below.

20.   Defendant, by and through his management employees, retaliated and/or discriminated against Plaintiff on the basis of military background and/or affiliation in profiling as follows:

20.1   When on or about management used Plaintiff's military background to her detriment in profiling her as a perceived threat.

20.2   When Management discussed Plaintiff's military background liberally in violation of Plaintiff's privacy and/or confidential personnel records with Revenue Department employees, Federal Protective Services and/or contracted security guards.

20.3    When on February 24, 2011 at Managements' request, Plaintiff was treated as a criminal and/or a threat as she was escorted through the entire Spec and TAC area full of Taxpayers by two fully armed FPS (Martinez and Knox), an armed contracted guard (Lopez) and Vanhoutan.

20.4    When on or about March of 2011, at Managements' request, Plaintiff was treated as a criminal and/or a threat as she was escorted from the TAC area to the front of the Federal Building by armed FPS (Martinez and Knox), an armed contracted security guard (Lopez).

## EEOC TIMELINES

21.    Plaintiff declares she complied with EEOC timeliness in the filing and/or submission of her EEOC claims as follows:

21.1    Plaintiff was furloughed on ("non-duty") status from July 31, 2010 to December 20, 2010;

21.2    Plaintiff received notice of non-selection dated October 28, 2010 on or about November 2010, while on furlough status;

21.3    On or about November 4, 2010, Plaintiff contacted HR to question the basis of her non-selection for the ITAS position.  HR informed Plaintiff that emails notifying her of the non-selection were being sent to her work email. Plaintiff informed HR that she was on furlough status and she did not have access to work email.  HR informed Plaintiff an ERC# was being generated that would update changes on her status.  HR informed Plaintiff that she would have to wait till until she was off the furlough status to question the process and procedures of the non-selection.

21.4    On or about November 11, 2010@1300hrs, Plaintiff received a call from Madrid, IAR co-worker, who informed Plaintiff that two seasonal employees (Amparo Rosales and Rosalia) had been called off furlough status and had been working 2 to 3 weeks already and that another season employee from the Revenue Department (Rick Ramirez) had been called off furlough status and had been working in Plaintiff's IAR position for 3 weeks.

21.5 On or about December 10, 2010 Madrid called Plaintiff and stated that Vanhoutan was now grooming Rick Ramirez for the ITAS position while he was still working Plaintiff's IAR position. It was this conversation that triggered in Plaintiff a reasonable suspicion that she had been discriminated and to want to file an EEO Complaint but was not sure it would be possible since she was still on non-duty/non-pay, furlough status and according to human resources she could not question the process and/or procedures until off furlough status.

21.6    Plaintiff contacted IRS EEO in December 17, 2010 through IRS line 1866735747 and conveyed her belief that she was discriminated based on whistleblowing, age, sex, veterans preference, and/or military affiliation (Profiling).  Plaintiff was referred to contact Gloria Baker in

Dallas, 214-413-5873 or Angela Goodin, 512-4608122.  Plaintiff contacted Gloria Baker who stated that there were other ways of handling her EEO Complaint.  Plaintiff insisted on filing EEO Complaint and requested Mrs. Baker's Supervisor and Mrs. Baker's attitude changed and stated that she would have to go through the informal stage first and to expect a call within 72 hours.

      21.7    On or about December 18, 2010, Plaintiff contacted Vanhoutan to inform her that an EEO Complaint had been initiated. See Plaintiff's Exhibit 43.

      21.8    On or about December 20, 2010, on first day back from non-pay/furlough status, Grajeda (W&I Secretary) confirmed that Ramirez had been working as an IAR in Plaintiff's absence and that Ramirez had also been given the seasonal ITAS position.  Grajeda confirmed and/or validated Plaintiff's suspicions that she had been discriminated.

22.    On or about January 7, 2014 and January 21, 2014, ,Plaintiff received E.E.O.C. Notice of Right to Sue Letters dated January 2, 2014.  See Plaintiff Exhibits 1 thru 19.

23.  Plaintiff preserves right to amend and/or supplement.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests this Court enter the following relief in this matter:

    a.    Set this matter for trial by jury on a date certain;

    b.    Award Plaintiff general and compensatory damages in an amount exceeding $400,000;

    c.    Defendant be directed to re-employ Plaintiff;

    d.    Defendant be directed to promote Plaintiff in ITAS position;

    c.    Pre-judgment and post-judgment interest, as provided by law;

    d.    Award Plaintiff her costs and legal fees;

    e.    Award all other just and proper relief to include injunctive orders.

        I declare under penalty of perjury that the foregoing is true and correct.

        Dated:  April 4, 2014

Maria Saldana-Fountain
Proceeding Pro se
10919 Joe DiMaggio Cir
El Paso, TX 79934
915-345-1188
Email: godwithmaria@sbcglobal.net

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P.O. Box 77960
Washington, DC 20013

Maria D. Saldana-Fountain,
Complainant,

v.

Jacob J. Lew,
Secretary,
Department of the Treasury
(Internal Revenue Service),
Agency.

Appeal No. 0120123195

Hearing No. 451-2012-00131X

Agency No. IRS-11-0198-F

## DECISION

Complainant filed an appeal from the Agency's July 10, 2012 Final Order concerning her equal employment opportunity (EEO) complaint alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq. and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 et seq. For the following reasons, the Commission AFFIRMS the Agency's Final Order.

## BACKGROUND

At the time of events giving rise to this complaint, Complainant worked as a Clerk (Intake Assistance Clerk) at the Agency's Wage and Investment facility in El Paso, Texas. On January 23, 2011, Complainant filed an EEO complaint alleging that the Agency discriminated against her on the bases of sex (female), age (50), and reprisal for prior protected EEO activity under Title VII of the Civil Rights Act of 1964 the Age Discrimination in Employment Act of 1967 when:

1.  On October 28, 2010, Complainant learned that she had not been ranked as Best Qualified for an Individual Taxpayer Advisory Specialist ("ITAS"), GS-0501-5, position under vacancy announcement number 40-4110F4249B.

2.  On October 28, 2010, Complainant learned that she not selected for an ITAS, GS-0501-7, position under vacancy announcement number 40-4110F4250B.

PLAINTIFF'S EXHIBIT 1

2                                        0120123195

3.    On May 11, 2010, Complainant was not given the opportunity to work overtime.

4.    On June 8, 2010, Complainant was not provided training.

5.    On July 22, 2010, Complainant was not selected for a Tax Compliance Officer Position under Vacancy Announcement Number 100G2-SBX0029-526-5-9-KC.

6.    On July 22, 2010, Complainant was not selected for a Tax Compliance Officer Position under Vacancy Announcement Number 100G2-LMX0062-526-5-9-KC.

By letter dated April 6, 2011, the Agency dismissed claims (3) - (6) pursuant to 29 C.F.R. §1614.107(a)(2). The Agency found that Complainant initiated the EEO complaints process on December 17, 2010. The Agency found that Complainant had constructive notice of the time limit within which to contact an EEO Counselor and that each of these claims occurred beyond the 45-day time limit. The Agency dismissed claims (3) - (6) for untimely EEO Counselor contact. The Agency accepted claims (1) and (2) for investigation.

At the conclusion of the investigation, the Agency provided Complainant with a copy of the report of investigation and notice of her right to request a hearing before an EEOC Administrative Judge (AJ). Complainant requested a hearing.

By order dated June 19, 2012, the AJ assigned to the case dismissed claims (1) and (2) pursuant to 29 C.F.R. § 1614.107(a)(2). In her Decision, the AJ found that Complainant was notified of her nonselection by electronic mail message sent to her personal electronic mail address dated October 23, 2010. The AJ further found that Complainant had constructive knowledge of the 45-day time limit for initiating the EEO process and that Complainant reasonably suspected discrimination when she learned on October 23, 2010, that she was not selected. The AJ considered that Complainant submitted a request for assistance to the Agency's Employee Resource Center (ERC) on October 28, 2010, asking for help with the rejection letters she received for the identified positions. The AJ found no evidence that the notice that Complainant was not selected was not transmitted to Complainant's work electronic mail address while Complainant was not at her duty station. Finding no reason to extend the time limit for initiating the EEO process, the AJ dismissed claims (1) and (2) pursuant to 29 C.F.R. § 1614.107(a)(2) for untimely EEO Counselor contact.

The Agency subsequently issued a Final Order adopting the AJ's dismissal of the complaint for untimely EEO Counselor contact. On appeal, Complainant states that she did not suspect discrimination regarding claims (1) and (2) until she spoke with a co-worker on December 10, 2010.

PLAINTEFF'S EXHEBIT 2

## ANALYSIS AND FINDINGS

EEOC Regulation 29 C.F.R. § 1614.105(a)(1) requires that complaints of discrimination should be brought to the attention of the Equal Employment Opportunity Counselor within forty-five (45) days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within forty-five (45) days of the effective date of the action.   The Commission has adopted a "reasonable suspicion" standard (as opposed to a "supportive facts" standard) to determine when the forty-five (45) day limitation period is triggered.   See Howard v. Dep't of the Navy, EEOC Request No. 05970852 (Feb. 11, 1999).   Thus, the time limitation is not triggered until a complainant reasonably suspects discrimination, but before all the facts that support a charge of discrimination have become apparent.

EEOC Regulations provide that the agency or the Commission shall extend the time limits when the individual shows that she was not notified of the time limits and was not otherwise aware of them, that she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred, that despite due diligence she was prevented by circumstances beyond her control from contacting the Counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

In the instant case, we find the record supports the AJ's Decision and that the AJ properly dismissed Complainant's complaint pursuant to 29 C.F.R. § 1614.107(a)(2) for untimely EEO Counselor contact.   We find that Complainant states that she was not at her duty station from July 2010 through December 20, 2010, and that she was not notified by electronic mail messages sent to her work electronic mail address.   We find the record confirms that Complainant contacted the Agency's ERC regarding the selection process on October 28, 2010, indicating that she was either aware or reasonably suspected that she had not been selected for the identified positions by that date at the latest.   We further find, as did the AJ, that EEO information posters located in Complainant's workplace provided Complainant with constructive notice of the time limits for initiating the EEO process.   We find the AJ properly dismissed claims (1) and (2) pursuant to 29 C.F.R. § 1614.107(a)(2) for untimely EEO Counselor contact.   Furthermore, we find that claims (3) – (6) were also properly dismissed for untimely EEO Counselor contact.

## CONCLUSION

Based on a thorough review of the record and the contentions on appeal, we AFFIRM the Agency's Final Order.

## STATEMENT OF RIGHTS - ON APPEAL
## RECONSIDERATION (M0610)

The Commission may, in its discretion, reconsider the decision in this case if the Complainant or the Agency submits a written request containing arguments or evidence which tends to establish that:

PLAINTIFF'S EXHIBIT 3

4                                                          0120123195

1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the Agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), at 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 77960, Washington, DC 20013. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0610)

You have the right to file a civil action in an appropriate United States District Court within ninety (90) calendar days from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, filing a civil action will terminate the administrative processing of your complaint.

## RIGHT TO REQUEST COUNSEL (Z0610)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request from the Court that the Court appoint an attorney to represent you and that the Court also permit you to file the action without payment of fees, costs, or other security. See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c). The grant or denial of the request is within the sole discretion of the Court. Filing a request for an attorney with the Court does not extend your time in which to file a civil action. Both the request and

PlAINTIFF's EXHIBIT 4

5                                                    0120123195

the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations


January 2, 2014
Date

PLAINTIFF'S EXHIBIT 5

6                                        0120123195

## CERTIFICATE OF MAILING

For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.  I certify that this decision was mailed to the following recipients on the date below:

Maria D. Saldana-Fountain
10919 Joe DiMaggio Cir
El Paso, TX  79934


Mariam G. Harvey, Director, EO Programs
Department of the Treasury
Office of Civil Rights and Diversity
1500 Pennsylvania Avenue NW
Attn:  Met Square, Suite 445
Washington DC 20220


<u>January 2, 2014</u>
Date

_____
Compliance and Control Division

PLAINTIFF'S EXHIBIT 6

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
OFFICE OF FEDERAL OPERATIONS
P.O. BOX 77960
WASHINGTON, DC 20013

OFFICIAL BUSINESS

Reference #: 0120123195
Maria D. Saldana-Fountain
10919 Joe DiMaggio Cir
El Paso, TX 79934

7993433274 C072

PLAINTIFF'S EXHIBIT 7



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Maria Saldana-Fountain,
Complainant,

v.

Jacob J. Lew,
Secretary,
Department of the Treasury
(Internal Revenue Service),
Agency.

Appeal No. 0120123370

Hearing No. 451-2012-00150X

Agency No. IRS-11-0376-F

## DECISION

Complainant filed an appeal from the Agency's August 23, 2012, final order concerning her equal employment opportunity (EEO) complaint alleging employment discrimination. For the following reasons, the Commission AFFIRMS the Agency's Final Order.

## BACKGROUND

At the time of events giving rise to this complaint, Complainant worked as a Clerk (Initial Assistance Representative) at the Agency's Wage and Investment office in El Paso, Texas. On April 28, 2011, Complainant filed an EEO complaint alleging that the Agency discriminated against her on the basis of reprisal for prior protected EEO activity under Title VII of the Civil Rights Act of 1964 when:

1. On March 2, 2010, a coworker (E1) physically pushed Complainant's arm;

2. On May 28, 2010, E1 falsely told a taxpayer that she was Complainant's manager and advised the taxpayer to file a complaint regarding Complainant;

3. On June 4, 2010, when Complainant came in the office to work overtime, her manager, S1, advised Complainant that she was never put on the roster to work overtime;

4. On June 11, 2010, E1 referred to Complainant as a snitch;

PLAINTIFF'S EXHIBIT 8

5.  On June 24, 2010, S1 screamed at Complainant when she asked to be present at a meeting where Complainant was being discussed;

6.  On June 30, 2010, E2 screamed at Complainant in front of taxpayers;

7.  On July 16, 2010, E2 accused Complainant of not contacting her and letting E2 know that she had an appointment with a taxpayer;

8.  On July 30, 2010, Complainant learned that S1 never forwarded Complainant's Performance Appraisal for the Individual Tax Assistance Service (ITAS) Application to the Human Resource office;

9.  On December 22, 2010, E2 bumped Complainant's arm and stated loudly, "Excuse You";

10. On January 12, 2011 and January 18, 2011, S1 denied Complainant access to the Individual Data Retrieval Systems (IDRS);

11. On January 13, 2011, S1 denied Complainant access to the Field Assistant Management Information System (FAMIS) for training;

12. On January 21, 2011, S1 did not provide Complainant assistance in filling out a Compensatory Time Travel Worksheet;

13. In January 2011, Complainant learned that management did not take any action when on July 20, 2010, E2 drove her vehicle toward the Complainant when she was walking across a pedestrian zone;

14. On February 2, 2011, S1 called other employees to advise them that the office was closed because of bad weather;

15. On February 4, 2011, Complainant was denied On-the-Job training for IDRS;

16. On February 4, 2011, Complainant was denied overtime and access to the overtime schedule;

17. On February 11, 2011, E1 raised her voice and pointed her finger at Complainant in front of taxpayers;

18. On February 17, 2011, E3 screamed at her "Do you have any common sense?" and pushed an empty chair toward where Complainant was sitting;

19. On February 18, 2011, S1 shared emails that Complainant sent regarding coworkers to E3;

PLAINTEFF's EXHIBIT 9

3                                              0120123370

20.   On February 24, 2011, Complainant learned that E2 suggested to a taxpayer to file a complaint against Complainant;

21.   On February 24, 2011, Complainant was terminated from her position as an Initial Assistance Representative-Bilingual with the Internal Revenue Service during her probationary period; and

22.   On February 24, 2011, after her termination, S1 purposely escorted her through the Tax Assistance Center (TAC) area in front of employees and taxpayers.

At the conclusion of the investigation, the Agency provided Complainant with a copy of the report of investigation and notice of her right to request a hearing before an EEOC Administrative Judge (AJ). Complainant requested a hearing.

By order dated June 21, 2012, the AJ assigned to the case dismissed claims (1) through (8) and (13) pursuant to 29 C.F.R. § 1614.107(a)(1) for failure to state a claim. The AJ found that these incidents occurred prior to December 17, 2010, the date upon which Complainant initiated the EEO complaints process (in Agency Number IRS-11-0198-F).[1] Accordingly, the AJ found that reprisal failed as a basis for these claims and the AJ's order dismissed claims (1) through (8) and (13).

The AJ further determined that regarding the remaining claims and Complainant's overall claim of harassment, the complaint did not warrant a hearing. The AJ issued her decision without a hearing, dated July 31, 2012.

In her Decision, the AJ found that the material facts were not in dispute. Regarding Complainant's claim (11) (FAMIS), the AJ found that Complainant explained that she believed S1 was retaliating against her for failing to participate in the illegal destruction of government documents when S1 denied Complainant's request for FAMIS training. The AJ found that Complainant was not protected under EEO statutes from reprisal regarding illegal activities, and accordingly, claim (11) failed to state a claim of discrimination.

Regarding claims (12) (compensatory travel time worksheet) and (15) (on-the-job training for IDRS), the AJ found that when Complainant's manager, S1, told Complainant that she was busy at the time, but would help her later, Complainant found instructions elsewhere for completing the travel form she needed. The AJ found that Complainant was not aggrieved by the Agency actions described in claim (12). Similarly, the AJ found that S1 responded to Complainant's request for IDRS training by stating that Complainant had just attended other training. Complainant then, the AJ notes, successfully sought the assistance of other Agency employees. The AJ found that assuming the events in these two claims occurred as

---

[1] Agency case number IRS-11-0198-F was the subject of an appeal in Saldana-Fountain v. Dep't of the Treasury, EEOC Appeal No. 0120123195 (January 2, 2014).

PLAINTIFF'S EXHIBIT 10

Complainant alleged, Complainant was able to complete her work without S1's assistance and that neither denial by S1 was likely to deter other employees from pursuing the EEO process. Accordingly, the AJ found claims (12) and (15) failed to state claims of reprisal.

The AJ found no evidence that any co-workers knew of CP's prior EEO activity with the exception of S1 and E1. The AJ found no evidence to support Complainant's prima facie case of reprisal with respect to those incidents involving other employees. They were simply unaware of Complainant's EEO activity, the AJ found. Accordingly, claims (9) (E2 bumped Complainant's arm), (18) (E3 screaming at Complainant), and (20) (E2 suggested a taxpayer file a complaint against Complainant) which involved coworkers E2 and E3 failed, the AJ found, to establish a prima facie case of reprisal because Complainant presented no evidence from which a trier of fact could conclude that these employees were aware of Complainant's prior protected activity at the time the events occurred. The AJ therefore found that assuming the events occurred as alleged that Complainant did not present evidence that claims (9), (18), and (20) could have been motivated by reprisal.

Similarly, the AJ found that Complainant did not present evidence that E1 was aware of Complainant's EEO activity at the time E1 raised her voice and pointed her finger at Complainant. E1, the AJ noted, acknowledged that she learned of Complainant's EEO activity from Complainant herself, but Complainant did not establish that E1 knew of Complainant's protected activity before this incident occurred. The AJ found that Complainant failed to establish a prima facie case of reprisal harassment with respect to claim (17).

The AJ considered Complainant's overall claim of harassment and determined that even if such claims occurred as alleged, they were common workplace grievances that were not so numerous nor egregious as to rise to the level of harassment. In particular, the AJ noted that the trivial annoyances were not so numerous that they altered Complainant's employment. Accordingly, the AJ found that Complainant did not establish a prima facie case of reprisal harassment.

The AJ considered those claims individually apart from Complainant's overall claim of harassment and found that the Agency articulated legitimate, nondiscriminatory reasons for its actions. Specifically, with respect to claim (10), the undisputed evidence showed that Complainant sat at the front desk, and that the computer at her desk did not have a privacy screen to prevent disclosure of taxpayer information if IDRS were accessed from that station. The AJ found that Complainant presented no evidence to rebut S1's explanation and also found that other employees acknowledged that no one was allowed to access IDRS while stationed at the front desk for the same reason. The AJ noted that S1 informed Complainant that she could access IDRS from other work stations. The AJ found that Complainant did not show that the Agency's reasons for its actions were false and a pretext to mask discrimination.

With respect to claim (14), the AJ found the evidence showed that S1 called Complainant's home and cellular phone numbers when the Agency experienced inclement weather and the office was closed. The AJ found Complainant presented no evidence to rebut the Agency's

evidence of telephone records indicating the time and numbers S1 contacted to inform Complainant of the office closure. The AJ found that Complainant did not show that the Agency's explanation was false or a pretext to mask discrimination.

Regarding claim (16), the AJ considered S1's explanation that the Agency schedules permanent administrative employees for weekend overtime first and only schedules seasonal employees (such as Complainant) for overtime when a permanent clerk is unavailable. Additionally, the AJ noted that S1's failure to post the overtime schedule impacted all of the employees and that Complainant was not singled out for disparate treatment. The AJ further found no evidence to rebut the Agency's explanation or to show it was a mere pretext.

The AJ found that Complainant did not produce any of the electronic mail messages that she alleges S1 improperly shared with E3 (claim (19)). The AJ noted that for management to resolve disputes between coworkers, the Agency may be compelled to disclose the identity of the complaining employee as well as the nature of the complaints. The AJ found that assuming Complainant's allegations were true, as required for summary judgment, the AJ found Complainant presented no evidence that S1's actions were improper and motivated by reprisal.

The AJ further found that regarding claim (21), the record contained overwhelming evidence of Complainant's poor conduct and performance during her probation which resulted in the Agency's decision to terminate Complainant's employment during probation. The AJ noted that many instances of poor conduct were described in the letter notifying Complainant of her termination. Those incidents, the AJ noted, included complaints from taxpayers and tax professionals describing Complainant's manner as rude and unprofessional. The Agency noted that Complainant had a history of disruptive, aggressive, and threatening behavior toward her coworkers and a mail carrier. The AJ noted the undisputed evidence showed that she had inserted herself into an emergency situation with a child in the Taxpayer Assistance Center (TAC) during which she took it upon herself (despite being told by the Lead Security Officer to move away from the child who was being attended to) to put her finger down the child's throat because she thought the child was choking. The AJ found the Agency articulated ample nondiscriminatory reasons for her termination, plus the record revealed additional incidents of unprofessional conduct and poor performance that were not described in the termination letter itself, which Complainant did not show were untrue and a pretext to mask discrimination.

The AJ found that the Agency's policy is to escort all non-TAC employees while in the TAC controlled access area. Upon Complainant's termination on February 24, 2011 (claim (22)), Complainant was escorted out of the TAC, as any non-TAC employee would have been escorted. Complainant presented no evidence to show that she was treated differently than any other employee facing termination and did not present evidence from which a trier of fact could conclude that reprisal motivated the Agency's decision to provide an escort for her after termination of her position.

PLAINTIFF'S EXHIBIT 12

The AJ concluded that Complainant failed to show that she was subjected to reprisal discrimination as alleged.  The Agency subsequently issued a final order adopting the AJ's finding that Complainant failed to prove that the Agency subjected her to discrimination.

## ANALYSIS AND FINDINGS

The Commission's regulations allow an AJ to issue a decision without a hearing when he or she finds that there is no genuine issue of material fact.  29 C.F.R. § 1614.109(g).  This regulation is patterned after the summary judgment procedure set forth in Rule 56 of the Federal Rules of Civil Procedure.  The U.S. Supreme Court has held that summary judgment is appropriate where a court determines that, given the substantive legal and evidentiary standards that apply to the case, there exists no genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  In ruling on a motion for summary judgment, a court's function is not to weigh the evidence but rather to determine whether there are genuine issues for trial.  Id. at 249.  The evidence of the non-moving party must be believed at the summary judgment stage and all justifiable inferences must be drawn in the non-moving party's favor.  Id. at 255.  An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could find in favor of the non-moving party.  Celotex v. Catrett, 477 U.S. 317, 322-23 (1986); Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).  A fact is "material" if it has the potential to affect the outcome of the case.

If a case can only be resolved by weighing conflicting evidence, issuing a decision without holding a hearing is not appropriate.  In the context of an administrative proceeding, an AJ may properly consider issuing a decision without holding a hearing only upon a determination that the record has been adequately developed for summary disposition.  See Petty v. Dep't of Def., EEOC Appeal No. 01A24206 (July 11, 2003).  Finally, an AJ should not rule in favor of one party without holding a hearing unless he or she ensures that the party opposing the ruling is given (1) ample notice of the proposal to issue a decision without a hearing, (2) a comprehensive statement of the allegedly undisputed material facts, (3) the opportunity to respond to such a statement, and (4) the chance to engage in discovery before responding, if necessary.  According to the Supreme Court, Rule 56 itself precludes summary judgment "where the [party opposing summary judgment] has not had the opportunity to discover information that is essential to his opposition."  Anderson, 477 U.S. at 250.  In the hearing context, this means that the administrative judge must enable the parties to engage in the amount of discovery necessary to properly respond to any motion for a decision without a hearing.  Cf. 29 C.F.R. § 1614.109(g)(2) (suggesting that an administrative judge could order discovery, if necessary, after receiving an opposition to a motion for a decision without a hearing).

To establish a claim of harassment a complainant must show that:  (1) she belongs to a statutorily protected class; (2) she was subjected to harassment in the form of unwelcome verbal or physical conduct involving the protected class; (3) the harassment complained of was based on her statutorily protected class; (4) the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work

environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. See Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982). Further, the incidents must have been "sufficiently severe or pervasive to alter the conditions of [complainant's] employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). The harasser's conduct should be evaluated from the objective viewpoint of a reasonable person in the victim's circumstances. Enforcement Guidance on Harris v. Forklift Systems Inc., EEOC Notice No. 915.002 at 6 (Mar. 8, 1994).

With respect to element (5), an employer is subject to vicarious liability for harassment when it is created by a supervisor with immediate (or successively higher) authority over the employee. See Burlington Industries, Inc., v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2270 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2292-93 (1998). However, where the harassment does not result in a tangible employment action the agency can raise an affirmative defense, which is subject to proof by a preponderance of the evidence, by demonstrating: (1) that it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that complainant unreasonably failed to take advantage of any preventive or corrective opportunities provided by the agency or to avoid harm otherwise. See Burlington Industries, supra; Faragher, supra; Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors, EEOC Notice No. 915.002 (June 18, 1999). This defense is not available when the harassment results in a tangible employment action (e.g., a discharge, demotion, or undesirable reassignment) being taken against the employee. In the case of co-worker harassment, an agency is responsible for acts of harassment in the workplace where the agency (or its agents) knew or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action. Id.

Complainant can establish a prima facie case of reprisal discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination. Shapiro v. Soc. Sec. Admin., EEOC Request No. 05960403 (Dec. 6, 1996) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Specifically, in a reprisal claim, and in accordance with the burdens set forth in McDonnell Douglas, Hochstadt v. Worcester Foundation for Experimental Biology, 425 F. Supp. 318, 324 (D. Mass.), aff'd, 545 F.2d 222 (1st Cir. 1976), and Coffman v. Dep't of Veteran Affairs, EEOC Request No. 05960473 (Nov. 20, 1997), a complainant may establish a prima facie case of reprisal by showing that: (1) he or she engaged in a protected activity; (2) the agency was aware of the protected activity; (3) subsequently, he or she was subjected to adverse treatment by the agency; and (4) a nexus exists between the protected activity and the adverse treatment. Whitmire v. Dep't of the Air Force, EEOC Appeal No. 01A00340 (Sept. 25, 2000).

In the instant case, we find the record supports the AJ's Decision.

We note that Complainant's status as a whistleblower, claims based upon her military status, as well as allegations of prohibited personnel practices (apart from statutes enforced by the EEOC such as Title VII and the Age Discrimination in Employment Act) are not properly the subject

of an EEO complaint.  The Commission notes that we have no jurisdiction over claims of discrimination based on veteran status or whistleblowing claims.  <u>Frederick v. Dep't of Homeland Sec.</u> EEOC Appeal No. 03A40020 (Dec. 16, 2003) (citing <u>Glen v. Department of Veterans Affairs</u>, EEOC Request No. 05910927 (February 21, 1992) (veterans preference not within EEOC's jurisdiction)); <u>Roth v. Department of Commerce</u>, EEOC Request No. 05910129 (March 7, 1991).  We find the AJ properly dismissed claim (11) for failure to state a claim given Complainant's explanation that this event occurred in connection with Complainant's whistleblower activities.

We find the record reveals that Complainant filed two separate EEO complaints and that in each case, Complainant requested a hearing.  The record shows the AJ chose to deconsolidate EEOC Case No. 451-2012-00131X (Agency case number IRS-11-0198-F) from the instant case by order dated April 3, 2012.  We find the AJ properly exercised her discretion regarding the deconsolidation of Complainant's complaints and note that Complainant appealed the dismissal of her prior complaint (IRS-11-0198-F) in <u>Saldana-Fountain v. Dep't of the Treasury</u>, EEOC Appeal No. 0120123195 (Jan. 2, 2014).  We decline to disturb the AJ's decision regarding the processing of Complainant's complaints and given our finding regarding Complainant's claims in the instant complaint insofar as they are based upon reprisal, we find Complainant's overall claim of harassment was not fatally fragmented.

On appeal, Complainant does not specifically challenge the dismissal of those claims pursuant to the AJ's June 21, 2012 order that occurred prior to the commencement of Complainant's EEO activity in December 2010.  We find nothing in the record to support Complainant's possible argument on appeal that her complaint alleges discrimination on any basis other than reprisal for prior protected activity.  We find that the AJ properly dismissed claims (1) through (8) and (13) for failure to state a claim because Complainant failed to show that she engaged in protected activity prior to the time these events occurred and accordingly, the Agency could not have been motivated by reprisal, even if these events occurred as Complainant alleged.

We find the record further supports the AJ's determination that Complainant failed to establish a prima facie case of harassment based upon reprisal.  Specifically, we assume, without so finding, that the remaining incidents of Complainant's complaint occurred as alleged.  We find that Complainant presented no evidence demonstrating a causal relationship between her EEO activity and the events.  Significantly, we note that the variety of events involved a number of Complainant's co-workers, all but one of whom were unaware of Complainant's EEO activity, with no common theme or evidence of any group of employees acting in concert.  We note, as did the AJ, that most of the events involving Complainant's supervisor, S1, are nothing more than workplace disputes regarding Complainant's assignments, authorization, conduct, performance, and instructions.

We find the undisputed objective evidence supports S1's explanation that she placed calls to Complainant's telephone numbers to contact Complainant regarding the office closure.  Additionally, we find that regarding claim (22), Complainant did not identify any other

PLAINTIFF'S EXHIBIT 15

9                                                    0120123370

employees who had not engaged in EEO activity, who were not also escorted from the nonpublic area of the unit where Complainant worked, upon termination.

We find the Agency articulated legitimate, nondiscriminatory reasons for its actions concerning each of Complainant's allegations of harassment at the hands of S1, as well as with respect to Complainant's termination (claim (21)).    We concur with the AJ, that the Agency set forth an abundance of instances where Complainant's conduct and performance during her probation fell below S1's expectations and no evidence that Complainant's EEO activity played any role in the Agency's decision to terminate her employment during probation.

CONCLUSION

Based on a thorough review of the record, we AFFIRM the Agency's Final Order.

STATEMENT OF RIGHTS - ON APPEAL
RECONSIDERATION (M0610)

The Commission may, in its discretion, reconsider the decision in this case if the Complainant or the Agency submits a written request containing arguments or evidence which tend to establish that:

1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or
2.    The appellate decision will have a substantial impact on the policies, practices, or operations of the Agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) within thirty (30) calendar days of receipt of this decision or within twenty (20) calendar days of receipt of another party's timely request for reconsideration. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), at 9-18 (November 9, 1999). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 77960, Washington, DC 20013. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

PLAINTIFF'S EXHIBIT 16

10                                    0120123370

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0610)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar** days from the date that you receive this decision.  If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court.  "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative** processing of your complaint.

## RIGHT TO REQUEST COUNSEL (Z0610)

If you decide to file a civil action, and if you do not have or cannot afford the services of an attorney, you may request from the Court that the Court appoint an attorney to represent you and that the Court also permit you to file the action without payment of fees, costs, or other security.  See Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794(c).  **The grant or denial of the request is within the sole discretion of the Court.**  Filing a request for an attorney with the Court does not extend your time in which to file a civil action.  Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File a Civil Action").

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations


January 16, 2014
Date

PLAINTIFF's EXHIBIT 17

11                                    0120123370

## CERTIFICATE OF MAILING

For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.   I certify that this decision was mailed to the following recipients on the date below:

Maria Saldana-Fountain
10919 Joe DiMaggio Cir
El Paso, TX  79934


Mariam G. Harvey, Director, EO Programs
Department of the Treasury
Office of Civil Rights and Diversity
1500 Pennsylvania Avenue NW
Attn:  Met Square, Suite 445
Washington DC 20220


January 16, 2014
Date

Compliance and Control Division

PLAINTIFF's EXHIBIT 18

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
OFFICE OF FEDERAL OPERATIONS
P.O. BOX 77960
WASHINGTON, DC 20013

OFFICIAL BUSINESS

Reference #: 0120123370
Maria Saldana-Fountain
10919 Joe DiMaggio Cir
El Paso, TX  79934

79934327415

# Bargaining Unit Performance Appraisal and Recognition Election
(Review instructions before completing this form)

| 1. Name of employee (Last, first, middle initial)<br>Saldana-Fountain, Maria | 2. Social Security Number<br>***-**-2215 | 3. Reason for Appraisal<br>☐ Annual Rating<br>☒ Other<br>Reason for other:<br>Merit Promotion |
|---|---|---|
| 4. Office symbols/Organization<br>9340414119040404 00/GROUP 444 - EL PASO, TX | 5. Pay plan, series and grade<br>GS-0303-05 | |
| 6. Position title<br>Init Ast Rep | 7. Period covered<br>From:01-MAR-2010 To:28-FEB-2011 | 8. Mandatory progress review was<br>conducted on 27-JUL-2010 |

9. Fair and Equitable Treatment of Taxpayers Retention Standard Rating ☐ Not Applicable ☒ Met ☐ Not Met

| 10. Critical Job Elements (CJEs) | 11. Performance Aspects | 12. Performance Aspects Rating | | | | 13. CJE Ratings |
|---|---|---|---|---|---|---|
| | | Exceeds | Meets | Fails | N/A | |
| I. Employee Satisfaction - Employee Contribution | A. Workplace Interaction | | X | | | Fully Successful |
| | B. Workgroup Involvement | | X | | | |
| | C. Workplace Environment | | X | | | |
| II. Customer Satisfaction - Knowledge | A. Automation | | X | | | Fully Successful |
| | B. Administrative Services | | X | | | |
| | C. Management Support | | X | | | |
| III. Customer Satisfaction - Application | A. Work Application/Identification | | X | | | Fully Successful |
| | B. Decision Making | | X | | | |
| | C. Communication | | X | | | |
| IV. Business Results - Quality | A. Accuracy of Work | | X | | | Fully Successful |
| | B. Problem Identification | | X | | | |
| | C. Security and Disclosure | | X | | | |
| V. Business Results - Efficiency | A. Time Utilization | | X | | | Fully Successful |
| | B. Workload Management | | X | | | |
| | C. Assignment Completion | | X | | | |

| 14. Overall rating | ☐ Outstanding ☐ Fully Successful ☐ Unacceptable<br>☐ Exceeds Fully Successful ☐ Minimally Successful<br>☐ Not Ratable   Reason for Not Ratable: | 15. Average CJE Score   3.00 |
|---|---|---|

**A. Certification of Rating** - *By signing below, each Rater and Reviewer certifies that records of tax enforcement results (ROTERs) were not used to prepare this appraisal.*

16a. Rater name/title/signature/date   *Charla Vashouza*   7/27/2010

16b. Reviewing Official name/title/signature/date

16c. Employee signature/date   *(Signature only indicates copy has been received, not agreement)*
*Maria D. Saldana-Fountain*   07-27-2010

| 17a. Revalidation of Rating of Record *(Period covered)* | 17b. Mandatory progress review conducted on | 18a. Revalidation of Rating of record *(Period covered)* | 18b. Mandatory progress review conducted on |
|---|---|---|---|
| From:        To: | | From:        To: | |
| 17c. Rater name/title/signature/date | | 18c. Rater name/title/signature/date | |
| 17d. Reviewing Official name/title/signature/date | | 18d. Reviewing Official name/title/signature/date | |
| 17e. Employee signature/date *(Signature only indicates copy has been received, not agreement)* | | 18e. Employee signature/date *(Signature only indicates copy has been received, not agreement)* | |

Form **6850-BU** (1-2003)   Cat. No. 35509M   page 1   publish.no.irs.gov   Department of Treasury - **Internal Revenue Service**

PLAINTIFF'S EXHIBIT 20

## Overall Summary

You reported to work on March 1, 2010 and you are scheduled to be placed in non-duty status effective July 31, 2010.

This narrative will be attached to an appraisal prepared for a promotion application you have submitted. It will also serve as an adhoc Release/Recall performance appraisal for the five month period from March 1, 2010, through July 31, 2010 and as your mid-year review which is due by August 31, 2010. Your normal appraisal period, based on the last digit of your social security number, is from March 1, 2010 to February 28, 2011. Your annual performance appraisal for this rating period would normally be due by March 31, 2011.

Employee Satisfaction ¿ Employee contribution

Your work is rated as fully successful in this critical element.

You have proven yourself to be very dependable and reliable. You always open the door to the TAC lobby promptly at 8:30 and are ready to assist the taxpayers in any way you can.

You generally keep me informed about the situation in the lobby. This is extremely important since I cannot see the lobby from my office.

At group meetings you provide valuable input with regard to identifying and offering solutions to workgroup issues.

Customer Satisfaction ¿ Knowledge

In this element your performance is rated as fully successful.

You reported to work on March 1, 2010 well after filing season had begun. You jumped right in to learn what you could to help make sure the traffic in the lobby moves smoothly. You learned how to use the Q-Matic system and you learned how to order forms and publications.

You were unable to attend and IAR training class since the filing season had already begun so you had to rely strictly on OJI to learn what you needed in order to perform your job duties. Additionally, you have only been here for five months which is not sufficient time to learn the fully scope of duties in the IAR position. Despite that, you always assisted customers that you had the training and knowledge to assist.

Customer Satisfaction ¿ Application

In this critical element your work is rated as fully successfully.

Your decision making has been appropriate. On a daily basis you deal with a wide variety of taxpayer issues, as you gain more experience in the area, you will become more adept at making decisions on how best to handle each issue.

Business Results ¿ Quality

*Continued on Next Page*

PLAINTIFF'S EXHIBIT 21

With respect to this critical element your work is rated as fully successful.

You continue to gain knowledge of Field Assistance procedures.

The biggest challenge to the El Paso TAC is excessive customer wait times.  You generally notify me and the ITASs of wait time problems as they occur.  The IRM requires that all customers with a number be assisted within the TAC work hours.  You are aware of this requirement and generally make the decision when it is appropriate to stop handing out tickets so this IRM requirement can be met.  You are also aware that, per the IRM, all customers with forms, payments, and easily handled issues are assisted even if we have stopped issuing numbers for the day and take the necessary action to see that these taxpayers are assisted.

You are sensitive to security/disclosure issues.  You ask customers to wait by the sign if you are assisting another taxpayer to avoid possible disclosure and lack of privacy at your desk.

There were no violations noted at your desk during the After Hours Security reviews that I conducted during this rating period.

Business Results ¿ Efficiency

Under this critical element your performance is rated as fully successful.

You submit your FAMIS data and 3081s to the group secretary in a timely manner.  You generally submit leave requests in advance of when the leave is to be taken.

You use your time efficiently.  You report to work on time.  You take it upon yourself to see that the last customer in the lobby has been called in by one of the ITASs before you leave the front desk

Thank you for your assistance during this filing season.  The job you do is extremely important in that it allows us to provide quality customer service to the taxpayers.

PLAINTIFF' EXHIBIT 22



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
ATLANTA. GA 30308

**Wage & Investment Division**

Date:  February 24, 2011

A COPY OF THIS LETTER MAY AT YOUR OPTION BE GIVEN TO NTEU

Maria Saldana-Fountain
Field Assistance Area 4
Territory 5, Group 444
El Paso, TX.

Dear Ms. Saldana-Fountain:

This is a notice of my decision to terminate your employment with the Internal Revenue
Service, effective February 24, 2011 in accordance with Part 315.804 of the Office of
Personnel Management (OPM) regulations.

On March 1, 2010 you were appointed to a Seasonal Career-Conditional Initial
Assistance Representative (IAR), GS-303-5 position. Your appointment is subject to
satisfactory completion of a one-year probationary period. The probationary period is a
one year period, beginning with your enter on duty (EOD) date and ending 1 year from
the EOD date. The purpose of the probationary period is to allow you an opportunity to
demonstrate the skills, performance and conduct necessary for continued employment.
If management determines that performance and/or conduct issues exist, you may be
terminated with limited appeal rights. At your orientation meeting, your manager talked
about your probationary status. You were placed into non work status on July 31, 2010
and returned to duty on December 20, 2010. When you returned to duty you and your
manager had a general discussion reminding you of items discussed at your orientation
such as ethics requirements. Your manager told you that she hopes you have a better
season this year than last filing season because she doesn't like the drama.

This termination during your probationary is based on my determination that you have
failed to demonstrate acceptable performance and conduct, as explained below.

On June 21, 2010, you had an altercation with a taxpayer who came to the Taxpayer
Assistance Center (TAC) for assistance. You provided her with a number and she
waited to speak with an Individual Taxpayer Advisory Specialist (ITAS). While the
taxpayer was waiting, she looked for her number and could not find it. She approached
you and insisted you had not given her a number. You became very upset and started
to raise your voice. You lost your patience and called the security guard to escort the
taxpayer out of the TAC. While the taxpayer was being escorted out of the TAC, she
found the number in her purse and asked the guard if she could return to the TAC to
apologize to you for her mistake. When the guard brought the taxpayer back into the

*PLAINTIFF'S EXHIBIT 23*

TAC you immediately challenged him and said words to the effect of how dare you bring her back in here and you insisted on speaking to the guard's supervisor. The guard left the TAC with the taxpayer and went to the Federal Protective Services (FPS) office. The taxpayer complained to the FPS supervisor how she was treated. The FPS supervisor, the guard and the taxpayer returned to the TAC at which time you told the FPS supervisor you wanted the taxpayer out of here. When the FPS supervisor told you that was not your call to make; you rudely asked him who he was and who he worked for. The FPS supervisor and the guard went to your manager's office to advise her of the incident. You entered your manager's office and asked if you needed to be there. Your manager told you no; to which you answered if they were discussing you, you need to be there. Later that day, your manager spoke with you and an NTEU representative about the incident. Your manager cautioned you about being courteous to taxpayers and provided you with pertinent IRM sections and Document 12011, Plain Talk about Ethics. These expectations were clearly stated to you during that meeting.

Another taxpayer visited the TAC with documents to be sent to Austin and asked you for copies of the documents. You refused to make copies stating that copies were provided as a courtesy. When the taxpayer stated as a courtesy you can provide copies to her, you refused and got very upset with the taxpayer and raised your voice. The taxpayer left the TAC, upset and crying and told the security guards what happened. The security guards approached another TAC employee and asked if she would get copies for the taxpayer. You became upset with the other TAC employee and demanded to know why she had helped the taxpayer after you had refused to do so.

On another occasion, you had an altercation with a United States Postal Employee when he approached you and asked you to sign for a certified letter. His attempts to contact anyone else from his contact list had been unsuccessful. You refused to sign for the letter and became upset when he persisted explaining that this had been done in the past. You asked the mailman for his name and supervisor's name, then at lunch time you went to the post office and spoke with the mailman's manager complaining about his behavior.

Prior to you being placed in non work status, in July of 2010, you were seen by the guard leaving the office with numerous plant cuttings. It was discovered that the plant cuttings were taken from the plant of a TAC employee who was out of the office in training. When the TAC employee returned from training she discovered that her plant had been cut severely on one side and that side was then put toward the back so as not to be noticed. You did not have permission to take cuttings from the TAC employee's plant and did so without her knowledge.

During a group meeting on January 26, 2011, a discussion took place concerning the fact that an ITAS had personal identifying information (PII) on her desk when a taxpayer entered her cubicle. As an IAR, who directs taxpayers to ITAS's for assistance, the ITAS requested that in the future please take that fact into consideration before sending a taxpayer into her cubicle and make sure she is available. You became upset stating that the ITAS has to make up her mind and you can't be guessing when you can and can't send a taxpayer into the ITAS's cubicle. The ITAS requested that you provide the courtesy of a simple phone call before sending taxpayers to her cubicle. You cut her off and started raising your voice while you got up and walked out of the meeting.

PLAINTIFF'S EXHIBIT 24

Also on January 26, 2001, when your manager spoke with you about checking with the ITAS before sending a taxpayer to their cubicle, you asked about pulling up taxpayer PII/IDRS at the front desk. Your manager told you, "No", because of the way the desk was set up the information could be seen by anyone approaching the desk. You persisted stating that IDRS was part of your training and you wanted to use it. Your manager told you she was not saying you could not use IDRS, but not at the front desk. You would have to find an empty computer elsewhere in the TAC. A discussion about data filters ensued and your manager said she would look into ordering them but not to access IDRS from the front desk until the filters were received. On February 9, 2011 your manager came to the front desk and saw AMS with PII open on your computer. When she confronted you about it you pointed at your co-worker and said your manager was only at your desk because the co-worker told the manager that you had the information pulled up on your computer.

On February 11, 2011 there was an altercation between you and your co-worker at the front desk. It is reported that you accused your co-worker of touching your stuff and that you were yelling and slamming drawers in front of a lobby full of taxpayers.

On February 11, 2011, your manager assigned you the task of organizing the forms room because the manager found incorrect and outdated (2009) instructions on the shelves in the TAC lobby. On February 15, 2011, your manager asked you if the task had been completed and you said no. In an email you stated, "Regarding my being assigned to work in the publication room is not something I want to continue to do. I was employed to work a specific job and I don't mind if you want to move me to a different area but it has to be something that is equivalent to what my work is." Your co-worker finished the task of organizing the forms room.

On February 17, 2011, there was a medical emergency involving a child who had been placed on a bench outside the door of the TAC by the guard. The guard is trained as a first responder and had the situation under control and was monitoring the child while waiting for 911 to respond. You took it upon yourself to approach the child and started touching him all over the head and face and saying, *he choking, he's turning purple, he can't breath.* The guard told you that you needed to leave; they had the situation under control. You then stuck your finger in the child's mouth and the guard told you to step back as you were interfering with the emergency care of the child.

Your manager has received other information and allegations from your co-workers as well as other IRS employees. Your behavior as outlined above is not acceptable and can no longer be tolerated. You have not demonstrated the conduct necessary for continued employment; therefore you are being terminated during your probationary period.

You have the right to appeal this action to the Merit Systems Protection Board (MSPB), Dallas Field Office, 1100 Commerce Street, Room 6F20, Dallas, TX 75242-9979 or by FAX to (214) 767-0102, in accordance with Title 5, CFR, Part 315. Your appeal may be based only on the allegation that this action was based, in whole or in part, on your marital status or political affiliation.

PLAINTIFF'S EXHIBIT 25

A copy of the Merit Systems Protection Board regulations may be found at http://www.mspb.gov/title5.html#1200%20Board. General instructions on filing appeals including access to this material and to the form for Designation of Representative are at https://e-appeal.mspb.gov/. Section 1201.24(a) of the regulations tells you what information must be included in your written appeal to the Board. You may use the appeal form included as Appendix I to the regulations, although it is not required that you file your appeal using the form. However, since completion of the form would constitute compliance with the requirements of Section 1201.24(a), you are encouraged to use the form. To be timely, an appeal to the Board must be filed no later than 30 days after the effective date, if any, of the action being appealed, or 30 days after the date of receipt of the Agency's decision, whichever is later. Where an appellant and an agency mutually agree, in writing, to attempt to resolve their dispute through an Alternative Dispute Resolution (ADR) process prior to timely filing of an appeal, the time limit for filing the appeal is extended by an additional 30 days, for a total of 60 days. Filing can be by personal delivery or by facsimile during normal working hours to the Board field office indicated above, in which case the date of the mailing is the date of the filing. If you do not submit an appeal within the time set by Board regulations, the appeal will be dismissed as untimely filed unless a good reason for the delay is shown.

The MSPB accepts appeals in several different formats. You can find out more information about how to file an appeal at https://e-appeal.mspb.gov/. This MSPB website explains the options on how to file an appeal. In summary, you may file a paper appeal (either Form 185, or the appellant's letter or other written format) by regular mail, facsimile (FAX) or commercial or personal delivery or you may prepare and file your appeal electronically using 3-Appeal, the Board's internet filing procedure.

Should you allege that the action taken against you was based, in whole or in part, on discrimination because of race, color, religion, sex, age, national origin, or physical or mental disability, you may appeal the discrimination allegation through the Service's discrimination complaint system under Part 1614 of Title 29, Code of Federal Regulations. To appeal under 29 CFR Part 1614, the allegation must be brought to the attention of an EEO Counselor within 45 calendar days of the effective date of this action.

You may not appeal an allegation of discrimination because of race, color, religion, sex, age, national origin or a handicapping condition to the MSPB unless you also allege that the action was based, in whole or in part, on your marital status or political affiliation. In that event, you may appeal all allegations of discrimination to the MSPB.

In addition to any right you may have to appeal to the MSPB or Equal Employment Opportunity Commissioner (EEOC), you may also have the right to file charges or complaints with the Federal Labor Relations Authority (FLRA), Office of Special Counsel (OSC), the Office of Personnel Management (OPM) or other Federal agencies if you believe your rights have been violated and your claims are within their jurisdiction.

PLAINTIFF'S EXHIBIT 26

Information about appeal rights and procedures may be obtained from your Human Resources Specialist or your EEO Counselor.

An SF-50, Notification of Personnel Action, effecting your termination will be forwarded to you when available.

Sincerely,

Andrew Reece
Territory 4 Manager, W&I FA
Farmers Branch, TX.

Receipt Acknowledged:

_____          Sep 24. 2011
Employee Signature                     Date

PLAINTIFF'S EXHIBIT 27



*Office of the Under Secretary*
*National Protection and Programs Directorate*
U.S. Department of Homeland Security
Washington, DC 20528

**Homeland Security**

September 30, 2011

**SENT VIA EMAIL TO: GODWITHMARIA@SBCGLOBAL.NET**
Maria Saldana-Fountain

Dear Ms. Saldana-Fountain:

Re: **NPPD11F218**

This is the electronic final response to your Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS), dated May 11, 2011, and received by this office on May 11, 2011. You are seeking copy of an Incident Report.

The report we have identified as responsive to your request is maintained in a system of records known as the "WEB RMS," Incident Reporting, Investigation and Security Case Files. The "WEB RMS" System of Records has been exempted by DHS from Privacy Act access provisions. However, DHS does consider individual requests on a case-by-case basis to determine whether or not information can be released.

In this case, a search of the Federal Protective Service for documents responsive to your request produced a total of two pages. I have determined that the pages of the records are partially releasable pursuant to Title 5 U.S.C. § 552 (b)(6) and (b)(7)(C), FOIA Exemptions 6 and b7(C).

Enclosed are two pages with certain information withheld as described below.

**FOIA Exemption 6** exempts from disclosure personnel or medical files and similar files the release of which would cause a clearly unwarranted invasion of personal privacy. This requires a balancing of the public's right to disclosure against the individual's right to privacy. The privacy interests of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information. Any private interest you may have in that information does not factor into the aforementioned balancing test.

**FOIA Exemption 7(C)** protects records or information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy. This exemption takes particular note of the strong interests of individuals, whether they are suspects, witnesses, or investigators, in not being unwarrantably associated with alleged criminal activity. That interest extends to persons who are not only the subjects of the investigation, but those who may have their privacy invaded by having their identities and information about them revealed in connection with an investigation. Based upon the traditional recognition of strong privacy interest in law enforcement records, categorical withholding of information that identifies third parties in law enforcement records is ordinarily appropriate. As such, I have

PLAINTIFF'S EXHIBIT 28

determined that the privacy interest in the identities of individuals in the records you have requested clearly outweigh any minimal public interest in disclosure of the information. Please note that any private interest you may have in that information does not factor into this determination.

You have a right to appeal the above withholding determination. Should you wish to do so, you must send your appeal and a copy of this letter, within 60 days of the date of this letter, to: Associate General Counsel (General Law), U.S. Department of Homeland Security, Washington, D.C. 20528, following the procedures outlined in the DHS regulations at 6 C.F.R. § 5.9. Your envelope and letter should be marked "FOIA Appeal." Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia.

The Office of Government Information Services (OGIS) mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974. If you wish to contact OGIS about a FOIA, you may email them at ogis@nara.gov or call 1-877-684-6448.

Provisions of the FOIA allow us to recover part of the cost of complying with your request. In this instance, because the cost is below the $14 minimum, there is no charge. 6 CFR § 5.11(d)(4).

If you need to contact our office again about this matter, please refer to **NPPD11F218**. This office can be reached at 703-235-2211.

Sincerely,

FOIA OFFICE
National Protection and Programs Directorate

Enclosure(s):  Responsive Documents, 2 pages

PLAINTIFF's EXHIBIT 29

# FEDERAL PROTECTIVE SERVICE
** FOR OFFICIAL USE ONLY **

| CASE NUMBER D11001660 ☐ Follow-up Report | Occur Date Span 02/17/2011 thru | | Occur Time Span 14:00:00 thru | | Report Date 02/17/2011 | Report Time 15:18:00 |
|---|---|---|---|---|---|---|
| Code 2050 | Type of Offense or Incident ASSISTANCE - " medical assistance (first aid, cpr, etc.)" | | | | Arrive Date 02/17/2011 | Arrive Time 14:00:00 |
| Building No. TXC27222 | Address RC WHITE FEDERAL BLDG - 700 E SAN ANTONIO EL PASO TX  79901 | | | | Rtn to Svc Dt 02/17/2011 | Rtn to Svc Tm 14:20:00 |
| Incident Location | Agency Name GSA - general services administration | | | | | Agency Code 4700 |

**A** | Est Num Dem ☐ 1-10 ☐ 11-50 ☐ 51-100 ☐ 101-300 ☐ 301-500 ☐ 500+ Est Num Evc ☐ 0 ☐ 1-10 ☐ 11-50 ☐ 51-100 ☐ 101-300 ☐ 301-500 ☐ 500+

**NARRATIVE**
See Narrative Continuation Report page.

---

**INVOLVED PERSON** ☒ Victim ☐ Witness ☐ Suspect ☐ Subject ☐ Report Person ☐ Govt Empl ☐ Govt Contr ☐ Other ☐ Missing Person

**B**

| No. | Name (last, first, middle) | | Alias | | Date of Birth / Age | | Sex | Race | Height | Weight | Eyes | Hair |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | (b)(6), (b)(7)c | | | | | | (b)(6), (b)(7)c | | | | | |

| Address (b)(6), (b)(7)c | City El Paso | State TX | Zip Code 79924 | Country United States |
|---|---|---|---|---|

| Driver's License Number | State | Social Security # | Nationality | Country of Birth | Home Phone |
|---|---|---|---|---|---|

| Scars, Marks, Tattoos / Other | Arrested ☐ | Citation Number | NCIC Number | Work Phone |
|---|---|---|---|---|

| Employer | Employer City | State | Employer Zip | Employer Country |
|---|---|---|---|---|

---

**INVOLVED PERSON** ☐ Victim ☒ Witness ☐ Suspect ☐ Subject ☐ Report Person ☐ Govt Empl ☐ Govt Contr ☐ Other ☐ Missing Person

**B**

| No. | Name (last, first, middle) | | Alias | | Date of Birth / Age | | Sex | Race | Height | Weight | Eyes | Hair |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | (b)(6), (b)(7)c | | | | | | (b)(6), (b)(7)c | | | | | |

| Address (b)(6), (b)(7)c | City El Paso | State TX | Zip Code 79924 | Country United States |
|---|---|---|---|---|

| Driver's License Number | State | Social Security # | Nationality | Country of Birth | Home Phone |
|---|---|---|---|---|---|

| Scars, Marks, Tattoos / Other | Arrested ☐ | Citation Number | NCIC Number | Work Phone |
|---|---|---|---|---|

| Employer | Employer City | State | Employer Zip | Employer Country |
|---|---|---|---|---|

---

**VEHICLE** ☐ Stolen ☐ Damaged ☐ Recovered ☐ Suspect ☐ Other ☐ Govt ☐ Evidence

**C**

| No. | License No | State | Reg Yr | Make | Model | Veh Yr | Value |
|---|---|---|---|---|---|---|---|

| R/O Name (last, first, middle) | Color | VIN | NCIC Number |
|---|---|---|---|

| R/O Address | City | State | Zip Code | Country |
|---|---|---|---|---|

---

**PROPERTY** ☐ Stolen ☐ Damaged ☐ Recovered ☐ Suspect ☐ Found ☐ Other ☐ Govt ☐ Evidence ☐ Weapon

**D**

| No. | Type | Make | Model | Color |
|---|---|---|---|---|

| Owner Name (last, first, middle) | Serial Number | Value | NCIC Number |
|---|---|---|---|

| Address | City | State | Zip Code | Country |
|---|---|---|---|---|

---

| Officer Names/Signature / IDs (b)(6), (b)(7)c | Date 02/17/2011 | Supervisor | Date Approved |
|---|---|---|---|

**Distribution:** ☐ Investigations ☐ AUSA ☐ Local Prosecutor ☐ RO ☐ Other _____
**Case Status:** ☐ Open ☒ Closed ☐ Unfounded

**3155 Report**

PLAINTIFF'S EXHIBIT 90

## FEDERAL PROTECTIVE SERVICE
** FOR OFFICIAL USE ONLY **

**Narrative Continuation**

2011-02-17 16:31:39.75

At 1400 hours while going through the lobby, I, [(b)(6), (b)(7)c] of Diamond Group was approached by a lady with her baby in her arms stating she needed help and that the baby was choking. I immediately took the baby into my arms and turned him over to check his mouth and breathing. I noticed the baby was gasping so he was not yet choking at the time. I then proceeded with the baby to a near by bench to lay him on his side. I checked for breathing and the color of the baby was normal. Baby seemed to be stiff in his arms and was not responsive. I determined baby was having convulsions and just monitored him until EMS arrived. The other officers in the lobby contacted EMS at the grandmother's request.

Federal Health Unit Nurse arrived and I advised her of the symptoms of the baby. She also concurred with me and advised just to monitor the infant. Once EPFD arrived at 1410 hours the baby was responsive and crying. The baby's grandma explained to EPFD that earlier the baby was sent home from the day care due to high fever. EPFD transported the baby to Providence Medical Center at 1420 hours. End of narrative.

OFFICER [(b)(6), (b)(7)c]

3155 Report

PLAINTEFF'S EXHIBIT 31

# Texas Workforce Commission

A Member of Texas Workforce Solutions

August 26, 2011

Maria Saldana-Fountain
10919 Joe DiMaggio Cir
El Paso, TX  79934

**Date Received: 8/10/2011**
Request No.    : 110810-013
Total Charges : $0.00
Balance Due   : $0.00

**RE:**   Maria Saldana-Fountain

Dear Maria Saldana-Fountain,

Enclosed is the information that you requested regarding the above-referenced subject.  There is no fee for providing this information to you.

If you have any questions about the enclosed information, please feel free to contact me at the address listed or call me at the number listed below. When making any further inquiries about this request, please reference the Request No. listed above.

Sincerely,

Michelle D. Smith
Administrative Assistant
512-936-3296

Texas Workforce Commission, Open Records Section
● 101 E. 15th Street, Room 266● Austin, Texas 78778-0001 ● Tel: (512) 463-2422 ● Fax: 512/463-2990 ●
● Relay Texas: 800-735-2989 (TDD) 800-735-2988 (Voice) ● open.records@twc.state.tx.us ● www.twc.state.tx.us ●
Equal Opportunity Employer/Services

PLAINTIFF'S EXHIBIT 32

```
 BND300O0              Benefits – Non-Monetary Determinations        08-26-11
 KLZ                           Issue Decision                        10:38:16
                                                                     1 more >
Action:  _                                                    Updt: 03-15-11 ZA4
       SSN: ████████  MARIA D FOUNTAIN
 Case Nbr: 14__
Issue Nbr: 1_ of: 4  Type: FIRED            Reason: INAPPROPRIATE CONDUCT

  Program: REG  Claim ID: 02-20-11    Claim Type: IC  Claim Dt: 02-20-11
                                      Issue Detection Dt: 03-02-11
             LEU: 99-999410-5  DEPARTMENT OF TREASURY
  Late LEU Response: N  Interested Party: Y  Charged: Y

       Other Employer:  _____

   Decision Date: 03-15-11  Time:  4:17 PM  Weeks Disqualified: __
                   Mailed Date: 03-16-11    Deductible Income: _____
                   Begin Date: 02-20-11                 State: __
                     End Date: _____      Incident Date: _____
       Claimant Failed to Respond: N                    Count: Y

F1=Hp        3=Ex 4=Mn 5=Navig                   9=Tg 10=Left  11=Right 12=Pr
CMD: _____
  Issue Determination 457292215-0-14-1 displayed successfully
```

PLAINTIFFS EXHIBIT 33

```
  BND30000              Benefits – Non-Monetary Determinations        08-26-11
  KLZ                             Issue Decision                      10:38:22
  < 1 more
  Action: I                                                    Updt: 03-15-11 ZA4
          SSN: ████████  MARIA D FOUNTAIN
  Case Nbr: 14__
  Issue Nbr: 1_ of: 4  Type: FIRED          Reason: INAPPROPRIATE CONDUCT

   Program: REG  Claim ID: 02-20-11    Claim Type: IC  Claim Dt: 02-20-11

  Qualified : Y_

  Rationale: PD.CREDENCE TO CLAIMANT; EMPLOYER FAILED TO PROVE_____
             MISCONDUCT INVOLVING AIDING A CHOKING CHILD._____
             _____

  Conclusion: FIRED-NOT DISCHARGED FOR MISCONDUCT-NOT DISQUALIFIED



  F1=Hp        3=Ex 4=Mn 5=Navig              9=Tg 10=Left  11=Right 12=Pr
  CMD: _____

  Scrolling performed.
```

PLAINTEFF'S EXHIBIT 34

```
                    Benefits - Non-Monetary Determinations          08-26-11
KLZ                          Fact Finding                           10:39:27
Action:                                                    UID: JE1
SSN: ████████    MARIA D FOUNTAIN              Case Nbr: 14___   Page 1
Issue Nbr: 1_ of: 4  Type: FIRED        Reason: FIRED - INTAKE STATEMENT
Stmt Nbr:  2_ of: 3  Stmt of: E  EMPLOYER    Taken: 03-10-11 01:11:15 PM

Name: SAMANTHA WATKINS_____    Title: TALX_____
Phn Stmt: Y Clm ID: 02-20-11   Clm Dt: 02-20-11 Rbtl: N Ftnote: Y 48HR msg: N


   Why were you fired? Reason you were given  _____
   _____
   _____
   _____
   ***********************************************************************
   Name of the person who told you that you were fired: _____
   _____
   Title of the person who told you that you were fired: _____
   _____


F1=Hp 2=Rules 3=Ex 4=Mn 5=Navig 6=Fnote        9=Tg 10=Left  11=Right 12=Pr
CMD: _____
   Record 457292215-0-14-1-2 displayed successfully
```

PLAINTIFF'S EXHIBIT 35

```
BND20000              Benefits - Non-Monetary Determinations        08-26-11
KLZ                            Fact Finding                         10:39:34
Action: I                                                   UID: JE1
SSN:         5   MARIA D FOUNTAIN              Case Nbr: 14       Page 2
Issue Nbr: 1  of: 4  Type: FIRED      Reason: INAPPROPRIATE CONDUCT
Stmt Nbr: 2  of: 3  Stmt of: E  EMPLOYER   Taken: 03-10-11 01:11:15 PM
```

**Did something specific happen that caused you to be fired?** _
**Explanation:** _____
_____
_____
_____
_____
_____
_____

**Did you have any warnings related to the reason you were given for being
fired?** _
**Explanation:** _____
_____
_____
_____
_____

```
F1=Hp 2=Rules 3=Ex 4=Mn 5=Navig 6=Fnote          9=Tg 10=Left  11=Right 12=Pr
CMD: _____
```
**Scrolling performed.**

PLANTIFF's EXHIBIT 36

```
BND42OO0          Benefits - Non-Monetary Determinations          08-26-11
KLZ      Employer Response To Notice Of Application For UI Benefits   10:44:38

Action: I  ....                                       Updt:
SSN:              MARIA D FOUNTAIN          PGM: REG  Claim ID: 02-20-11__
Claim Date: 02-20-11  Claim Type: IC

                       Employer:
             Correct Last Employer:
                 Monetarily Eligible:
                           EDI:

                    Notice Sent:
                         Due:
      Claimant Separation Reason:

                    Responded: _____
      Employer Separation Reason: __              Recall Date: _____
             TWC Action: _

          Current Investigator:
 F1=Hp 2=DtrAd 3=Ex 4=Mn 5=Navig          9=Tg 10=RspTy          12=Pr
 CMD: _____
  Record   does not exist
```

PLAINTIFF'S EXHIBIT 37

```
BND20000                Benefits - Non-Monetary Determinations          08-26-11
KLZ                            Fact Finding                             10:39:37
Action: I                                                    UID: JE1
SSN: ████████ MARIA D FOUNTAIN                  Case Nbr: 14      Page 3
Issue Nbr: 1 of: 4 Type: FIRED          Reason: INAPPROPRIATE CONDUCT
Stmt Nbr: 2 of: 3 Stmt of: E EMPLOYER   Taken: 03-10-11 01:11:15 PM
Did you do what you were warned about? _
Explanation: _____
_____
_____
_____
_____
_____
_____

* * * * * * * * * * * * * * * * * END * * * * * * * * * * * * * * * * * * * *




F1=Hp 2=Rules 3=Ex 4=Mn 5=Navig 6=Fnote        9=Tg 10=Left  11=Right 12=Pr
CMD: _____
Scrolling performed.
```

PLAINTIFF'S EXHIBIT 38

**Saldana-Fountain Maria**

| | |
|---|---|
| **From:** | Reyes Judy C TIGTA [Judy.Reyes@tigta.treas.gov] |
| **Sent:** | Friday, July 02, 2010 7:28 AM |
| **To:** | Saldana-Fountain Maria |
| **Subject:** | RE: CSIRC |

Morning.  I forgot to ask you one thing we ask all our employees who submit a complaint.  The question is not a real good one since the taxpayer was not identified.  However, TIGTA advised you that the "subject" has a right to access the information you've provided due to the Privacy Act. Do you request confidentiality?

Please respond ASAP.

Thanks, Maria

Judy

---

**From:** Saldana-Fountain Maria [mailto:Maria.Saldana-Fountain@irs.gov]
**Sent:** Thursday, July 01, 2010 1:59 PM
**To:** Reyes Judy C TIGTA
**Subject:** RE: CSIRC

Good Afternoon, Ma'am.

Unfortunately, the Federal Police chose not to file a report on this incident.  I do know that the TP was assisted but we don't know who it was that assisted her.

Thanks,
Maria Saldana-Fountain

---

**From:** Reyes Judy C TIGTA [mailto:Judy.Reyes@tigta.treas.gov]
**Sent:** Thursday, July 01, 2010 7:32 AM
**To:** Saldana-Fountain Maria
**Subject:** CSIRC

Good morning, Maria.  I got the CSIRC Report about the HTP.  The report does not list any identifiers for the TP. Do you have it?  I would need the name and SSN, at least.

Thanks

Judy C. Reyes
Special Agent, TIGTA
office: 210-841-2072
cell: 210-385-8689

7/2/2010

PLAINTIFF'S EXHIBIT 39

Fax To:  CDR Cooper

I apologize for not having this statement for you any sooner but my son had a tournament that started Friday after work till today.

I also want to give you a heads up Sir in that I have reported this to TIGTA due to disclosure issues and safety concerns.  I have follow TIGTA's Regulations and Compliance.

In bringing my concerns to you, it is my hope that we are better able to establish a good working relationship within the System.

Sincerely,

Maria Saldana-Fountain

PLAINTIFF'S EXHIBIT 40

On or about June 24, 2010 at approximately 1400 hrs, I was working the front counter at the Internal Revenue Service (IRS) located at 700 E. San Antonio, El Paso, Tx 79901. I was approached by a hostile, female, taxpayer (HTP) who was next in line. The HTP requested to see a representative and I asked to see her tax notice. HTP picked her black purse and dropped it on the counter. After fumbling through her purse, she found notice and I gave her a ticket number along with a survey card and politely told her that she could have a set and wait till she was called. She went to sit down and I called the next taxpayer (NTP). I was discussing the NTP's tax documents when HTP became irate while sitting in her chair and started hollering out that I had not given her a ticket while looking all around her chair. HTP repeatedly called me inept and stated that all the IRS was inept. As I looked in her direction, I could see her holding on to the survey card and her black purse. I continued helping NTP as I was sure she would find her ticket and gave her time to calm down. The next thing I know the HTP was standing directly next to the NTP while we were discussing NTP's documents. Due to disclosure issues, I requested HTP to move behind the "wait here" sign while I was discussing NTP's documents. HTP told me that she was not moving anywhere and started raising her voice and telling me that I was extremely inept and everyone in the IRS was inept. HTP stated that every time she comes to get assistance she had received bad service from everyone here. I told HTP that she had a couple of options; one was to stand behind the waiting sign, leave and come back another day or be escorted out. HTP stated that she was not moving anywhere and that I could do what I wanted. I went to the entrance and waived for a Security Guard (SG). Mr. Blanque responded and escorted her out the lobby. As HTP was leaving the area, I heard her tell SG that I had purposely not given her a ticket and that we were all inept at the IRS. I continued assisting TP's. As I was assisting another Taxpayer in line, Mr. Blanque, Mr. Knox and HTP came to the counter and told me that HTP would be staying because she was ready to apologize since she had finally found her ticket in her black purse, while talking to her outside. I stated that it was fine with me and waited to hear what she said. HTP spoke in spanish and told me that she had found her ticket but that she had been treated badly before and that is why she was reacting that way. I responded by telling her in spanish that we were here to serve her but that she could not be coming in yelling and calling us names. HTP cut my statement short by taking a step forward towards me and raising her finger and putting it directly in my face in a circular motion and stated that I had popped my fingers at her. I immediately took a step back and waited for Mr. Knox or Mr. Banque to interject but neither one did. It was at this point that I requested HTP be escorted out. Mr. Knox stated that HTP had already apologized and would be staying and getting assistance. Mr. Knox asked me if I had popped my fingers at her and I stated that I did not. Mr. Knox than stated that HTP had stated that I did. I asked Mr. Knox if he was taking HTP's word over mine. Mr. Knox did not respond. So I asked him again if he was taking HTP's word over mine. Mr. Knox did not respond and immediately requested to speak with my Manager. I immediately requested to speak to his Supervisor. Mr. Knox told me that he was the Supervisor and I requested to speak to someone higher and gave him a yellow pad to write his Suepervisor's contact information. Mr. Knox placed the yellow pad down and did not give me his Supervisor's contact information. I had my co-worker call my Manager and both Mr. Knox and Mr. Banque spoke with the Manager. I requested to be present during this discussion but it was declined. At approximately 1600 hrs, I walked over to Mr. Knox's office to request Supervisor's contact. At approximately 1610 hrs, I walked over to Mr. Knox's office to request copy of Incident Report. Mr. Knox advised me that there would not be any report filed on this incident.ENDOFSTATEMENT\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\\

Maria Saldana-Fountain
915-822-1193

PLAINTIFF'S EXHIBIT 41

**HP Officejet 7410**
Personal  Printer/Fax/Copier/Scanner

**Log for**
Fountain
9158221193
Jun  27  2010  11:41AM

---

**Last Transaction**

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Jun  27 | 11:39AM | Fax  Sent | 18176497221 | 1:27 | 2 | OK |

PLAINTIFF'S  EXHIBIT 42

**Subject: Informing you ....**
**Date:** Saturday, December 18, 2010 1:02 AM
**From:** Maria Saldana-Fountain <godwithmaria@sbcglobal.net>
**To:** Vanhoutan Charla B <Charla.B.Vanhoutan@irs.gov>

Hello Mrs. Charla,

Just wanted to inform you that I have contacted the eeo rep to initiate an eeo concern.

Thanks,
Maria Saldana-Fountain

PLAINTIFF'S EXHIBIT 43

**Saldana-Fountain Maria**

**From:** Saldana-Fountain Maria
**Sent:** Thursday, February 17, 2011 4:14 PM
**To:** Vanhoutan Charla B
**Subject:** Diana

Mrs. Charla,

Just to let you know Ms. Diana came up to the front upset and questioning whether i had common sense.  She seemed frustrated and confused.  I decided to call her to let her know that I do have common sense and she went off in saying that I should let erica guide and that because of me and erica their work relationship is suffering.  I told her that she did not know what was going on and perhaps not get involved.

This is so sinical because everybody here knows how badly they talk and try to sabotage each other and now it is all love.  Childish and ignorant at the same time.  Just keeping you informed.

2/18/2011

PLANTIFF'S EXHIBIT 44

**Saldana-Fountain Maria**

**From:**    Saldana-Fountain Maria
**Sent:**     Friday, February 18, 2011 9:34 AM
**To:**        Vanhoutan Charla B
**Subject:** Diana

I just want to respectfully advise you that the next time Ms. Diana comes up to the front making anymore ignorant statements in front of TP's I will lower myself to her level and answer her appropriately.  It is obvious Ms. Diana did not have common sense in bringing herself up here and making that statement like that.

Keeping you informed.......

2/18/2011

PLAENTFFE's EXHIBIT 45



**From:** *W&I-FA Area 4 Training Board
**Sent:** Thursday, January 20, 2011 2:05 PM
**To:**
**Cc:** *W&I-FA Area 4 Training Board; Correa Maritza D; Brown Michelle L; Gilliam Barbara A; Whitaker Pauline E
**Subject:** RE: Suggestion Form Submission



Thank you for your submission to the Area 4 Training Board. There have been many IAR's that have been qualified and advanced to ITAS positions. In some larger TAC's, the main IAR's function is only to direct the taxpayers. Depending on the traffic flow in the TAC offices, managers can "gate" the IAR's to allow them certain IDRS access or restrict IDRS in all. IAR's have limited command codes on IDRS because of the minimal work that they are required to do. As it states in the IAR SPD#93176, the need of IDRS and AMS are both required for the IAR position. In order for you to take any payments or to do transcripts, you must record history information in AMS! Disclosure issues are going to be everywhere regardless of where the IAR sits.

Unfortunately the only training classes that are available to IAR's at this time is the entry CORE class. There are many ELMS training classes that are available for you to take that will improve you in your current position and to familiarize with ITAS work. If you haven't already, I would suggest that speak with your manager to help you with creating a Career Learning Plan. Make sure to check the COL weekly to see all of the available position openings and apply for them. If you are willing to relocate, there maybe several options available.

We have many websites available that will help you in pursuing your career. One of the best ones I have found is the IRS Career Management Resource Center - CMRC. The CMRC is a tool designed to help you direct yourself in planning your career at the IRS. The CMRC will help you explore the possibilities available at the IRS, and help you define your career goals. You can find out what positions are in your current job family, find out about Career Paths, check out any or all of the jobs existing in the IRS and then find out what you need to do in order to prepare yourself for a position you would like to apply for in the future.

http://mycareerplan.web.irs.gov/index.asp

If you have any other suggestions to improve training please don't hesitate to submit them.

Sincerely,
The Area 4 Training Board

---

**From:**
**Sent:** Wednesday, November 03, 2010 11:30 AM
**To:** *W&I-FA Area 4 Training Board
**Subject:**

Thank You!

1/21/2011

PLAINTIFF'S EXHIBIT 46

## Saldana-Fountain Maria

**From:** Saldana-Fountain Maria
**Sent:** Monday, February 14, 2011 7:46 AM
**To:** Vanhoutan Charla B
**Subject:** Work

Mrs. Charla,

After the incident with Mrs.Madrid on February 11, 2011, I cannot overcome the anxiety in knowing that Mrs. Madrid wants me fired and is willing to do anything to see me gone.

Additionally, I recall the conversation that occurred around the end of July 2010, when Mrs. Madrid called Mr. Carrillo after closing the TAC area. Mrs. Madrid placed the call on speakerphone so I was able to listen to the entire conversation Mr. Carrillo and Mrs. Madrid had with each other. Mrs. Madrid asked him what were the procedures on pushing the panic button and who would respond. Mr. Carrillo told her the different entities that would respond and told that he needed to know if she was having problems. Mrs. Madrid stated that a recent incident with a TP had sparked the call. Mr. Carrillo stated that as far as he was concerned that he still very much cared for her and that he was giving her the information to her only because he could care less for her Co-worker. Mr. Carrillo continue to state that he felt the need to be protective of her and all she had to do is call upon him and he would respond immediately and that she already knew that. Mr. Carrillo reiterated that he did not care at all as to what the TP would do or not do to the Co-worker because his only concern was her and he would take matters into his own hands if any TP or Security Guard bothered her. After this phone conversation Mrs. Madrid hung up and stated to me that the Security Guards owed her and her ex-husband many favors and that is why they and her go way back and "take care of each other."

Throughout the time that I have been working at the IRS it has become obvious that there is a special close connection between Mrs. Madrid and the Guards. Some Guards are closer to her than others.

Mrs. Charla, based on the previous incident and the above information, I am asking that you please intervene in this matter immediately as I fear that Mrs. Madrid will do anything to get me fired. If after this email you persist in us working together  than I have no other option than to follow your directions even though my job is in jeopardy.

Last week when I came to your office to request to have a purely professional communication/environment with Mrs. Madrid there were reasons for my making such request.

Maria Saldana-Fountain

2/14/2011

PLAINTIFF'S EXHIBIT 47

**Saldana-Fountain Maria**

**From:**    Vanhoutan Charla B
**Sent:**    Thursday, February 17, 2011 9:37 AM
**To:**      Saldana-Fountain Maria
**Subject:** RE: Situation here at work

Thanks, I will check into this situation when I get back in to the office tomorrow morning.

**From:** Saldana-Fountain Maria
**Sent:** Thursday, February 17, 2011 9:33 AM
**To:** Vanhoutan Charla B
**Subject:** RE: Situation here at work

Just to let you know Mrs. Madrid and Mrs. Ruby came in late this morning.  I gave an 800# to a TP and Mrs. Ruby told TP that I had never told her she had appt.  This is ridiculous.

**From:** Vanhoutan Charla B
**Sent:** Thursday, February 17, 2011 9:10 AM
**To:** Saldana-Fountain Maria
**Subject:** RE: Situation here at work

I am in Las Cruces today and we can talk face to face tomorrow.  Your assignment to work the forms room is not a permanent thing.  As soon as all the old information that does not belong there is gone you will be back on the front desk.

I believe that if you will look at your Position Description you will find that stocking forms is one of the duties.  This includes the forms room as well as the shelves in the lobby.

*Charla Vanhoutan*

**Field Assistance Manager, Group 444**
**Wage & Investment**
**700 E. San Antonio MC 6680ELP**
**El Paso, TX  79901**
**Phone:  915-834-6522**
**Fax:     915-834-6530**
**e-mail:  charla.b.vanhoutan@irs.gov**

**From:** Saldana-Fountain Maria
**Sent:** Thursday, February 17, 2011 9:06 AM
**To:** Vanhoutan Charla B
**Subject:** Situation here at work

Mrs. Charla,

Just want to inform you that after much thinking, I contacted FPS yesterday.  I expressed my concerns regarding Mrs. Madrid's use of her authority and power based on her ex-husband Carrillo being FPS.  I also expressed my concerns regarding her making the statement to you that she would contact FPS if she perceived a threat coming from me.

2/18/2011

PLAINTIFF'S EXHIBIT 48

Throughtout the time I have worked here certain security guards are very close to Mrs. Madrid.  In fact, my sense is that certain security guards here know more about what is going on in our department than I do.

Regarding my being assigned to work in the publication room is not something I want to continue to do.  I was employed to work a specific job and I don't mind if you want to move me to a different area but it has to be something that is equivalent to what my work is.

I respectfully ask you to come to some sort of resolution to my concerns.

2/18/2011

PLAINTIFF'S EXHIBIT 49

**Saldana-Fountain Maria**

**From:**  Saldana-Fountain Maria
**Sent:**  Thursday, February 17, 2011 1:03 PM
**To:**  Vanhoutan Charla B
**Subject:** RE: Today

Mrs. Charla,

I am extremely disappointed that you are choosing not to admit that I did speak with you about all this men calling the front desk and coming by the front desk and speaking with Mrs. Madrid. I never mentioned Ruby because I never had a reason to. In fact I have had several conversations with you about this and the fact that you are my Manager and conveniently choosing not to remember is extremely concerning to me. I do want to advise you that it is illegal for you to retaliate for bringing my concerns to you. I have spoken with several Seniors and they have advised me that they feel my concerns are valid.

I also want to tell you that I very cleary and consistantly stated to you and her that I I want to have is a professional communication only. I told specifically that I did not want to speak with her on any other issues because she was telling me about tasting the cocaine and smelling the marijuana and i no longer know if what she is telling me is true or false. She also included the conversation the wife of another employee who works here. I have told you what is going on and you told that I should think about this and that you thought it was a good idea that I think about.

I have always and will continue to give you the proper respect but I do have to keep you informed as to what is going on because you need to know.

By the way the police officer Julius just called for Mrs. Erica again he questioned me on if she had her cell phone. I am again informing you that I am not her secretary unless that is what you direct me to do.

Thanks,

**From:** Vanhoutan Charla B
**Sent:** Thursday, February 17, 2011 12:01 PM
**To:** Saldana-Fountain Maria
**Subject:** RE: Today

Maria, I have taken the information you provided this morning under advisement.

II did not leave anyone acting because I am working. I can be reached in Las Cruces.

I also want to remind you that you are the one that told Erika that you did not want her to communicate with you. You said that to her in front of me, in my office on Friday February 11, 2011.

You have at no time mentioned men coming in to the office nor have you mentioned phone calls to me.

You state, "When I and others have indicated to you the unprofessionalism that is going on with these young ladies what you state is that we are a family but I just want to convey to you that my family is at home and I am expecting to work in a professional environment. I have addressed to you all the men that keep coming and calling for personal reasons and this continues." please see my comment below.

You have never before mentioned Ruby's name to me. I have always and will continue to stress the need and importance for everyone conducting themselves in a professional manner in the office. I would like to point out that at no time have I ever told you we are family. What I have told you is that at the office I expect everyone to be adult and professional and get the job done. I have also said that I expect personal feelings to be left outside

2/18/2011

PLAINTIFF'S EXHIBIT 50

the door at 700 E San Antonio.  I have also said many times that the Code of Conduct states that you will conduct your work relationships in a manner that does not cause dissension or discord.

You have at no time mentioned men coming in to the office nor have you mentioned phone calls to me.

Thank you.

*Charla Vanhoutan*

**Field Assistance Manager, Group 444**
**Wage & Investment**
**700 E. San Antonio MC 6680ELP**
**El Paso, TX  79901**
**Phone:  915-834-6522**
**Fax:     915-834-6530**
**e-mail:  charla.b.vanhoutan@irs.gov**

**From:** Saldana-Fountain Maria
**Sent:** Thursday, February 17, 2011 10:50 AM
**To:** Vanhoutan Charla B
**Subject:** Today

At approximately 10:00 I called Mrs. Arcy due to Mrs. Madrid walking off her work area and leaving two TP's up in the front desk.  She did not tell them anything and just left.  They asked me if she was coming back and I told them I did not know but if she did not assist them I would try to hel p them. After waiting I asked the TP's what they needed and they told me they needed their 2009 Transcript I gave them the transcript and called Mrs. Arcy to ask who was Acting.  Mrs. Arcy told me that you had not left anyone as Acting and that you were in las cruces. Mrs. Arcy asked me what had happende and I expained what Mrs. Madrid had done. I told her that it was extremely unprofessional what she had done with these two TP'x and the what had happened with what Ruby told the other lady about her appointment#.  Let me just tell you that when Mrs. Ruby makes an appt with a TP she did not explain to TP what happens when she is not in on time for TP.  Had she done that I am quite sure the TP would not have had a problem with waiting for her to show up.

When I and others have indicated to you the unprofessionalism that is going on with these young ladies what you state is that we are a family but I just want to convey to you that my family is at home and I am expecting to work in a professional environment.  I have addressed to you all the men that keep coming and calling for personal reasons and this continues.

I had to call Rosali to cover for me so that I can go on break.

Based on the fact that we are a little over capacity I am asking TPs to come tomorrow or later to make space.

2/18/2011

PLAINTIFF'S EXHIBIT 51

```
DUPLICATE

Court Name: TEXAS WESTERN
Division: 3
Receipt Number: 300019035
Cashier ID: vmedina
Transaction Date: 04/04/2014
Payer Name: MARIA SALDANA FOUNTAIN
-----------------------------------
CIVIL FILING FEE
 For: MARIA SALDANA FOUNTAIN
 Amount:        $400.00
-----------------------------------
CHECK
 Check/Money Order Num: 135095
 Amt Tendered:  $400.00
-----------------------------------
Total Due:      $400.00
Total Tendered: $400.00
Change Amt:      $0.00

CIVIL FILING FEE, DTXW314CV000124

MARIA SALDANA FOUNTAIN v. US. DEPT
OF TREASURY, et al.

DB / MAT
```